In the Matter of **FEASTER TRUCKING SERVICE, INC.,** Appellee, Cross-Appellant,

v.

**KINDSVATER, INC.** and Andy Kindsvater, Appellants, Cross-Appellees.

**Nos. 71–1321, 71–1322.**

United States Court of Appeals, Tenth Circuit.

May 8, 1972.

Stan E. Wisdom, Wichita, Kan. (Lawrence McDonough, and Jochems, Sargent & Blaes, Wichita, Kan., and Byron G. Larson, and Williams, Larson, Voss & Strobel, Dodge City, Kan., with him on the briefs), for appellants, cross-appellees.

Gerald Sawatzky, Wichita, Kan. (Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel, with him on the briefs), for appellee, cross-appellant.

Before SETH and BARRETT, Circuit Judges, and MECHEM, District Judge.

SETH, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Kansas.

The parties entered into a contract in which appellant-cross-appellee Kindsvater sold its livestock hauling business to appellee, Feaster Trucking Service, Inc. The contract provided for the sale of trucks, trailers, a Kansas Corporation Commission common carrier permit, and Kindsvater's agreement not to compete. The total consideration was $320,000, with a $40,000 down payment. Feaster was to execute and deliver a promissory note to Kindsvater personally for $50,-339.05 by December 31, 1967, and Kindsvater was to transfer the certificates of title covering the hauling equipment on receipt of this note. In addition, Feaster was to pay $5,000 for the common carrier permit upon the Kansas Corporation Commission's approval of the sale. The balance of the consideration was represented by Feaster's assumption of the unpaid balance owing on the hauling equipment. At the time the contract was executed the balances then owing were not precisely known, but the court below interpreted the contract as providing that Kindsvater would pay the holders of the various security interests whatever sums were necessary to reduce the balance required to pay off the loans to $222,660.95. Until the delivery of the certificates of title was due, Feaster was to have possession and the right to use the trucks under a lease.

Soon after acquiring the business, Feaster began to have financial troubles. James Feaster, the president of the company, met with a group of its creditors to discuss means of coping with the problem. One of the creditors later told Andy Kindsvater about the meeting, expressing the opinion that the Feaster corporation would be unable to meet its remaining obligations on the Kindsvater contract.

On December 31, 1967, Feaster delivered the $50,339.05 installment note to

Kindsvater, according to the contract. Kindsvater, however, refused to deliver the certificates of title, and filed suit in a Kansas court for cancellation of the contract. While this suit was in progress, Feaster was unable to secure further financing to meet the installments on the equipment contracts due largely to the fact that it was unable to provide collateral for a loan without the certificates of title.

Feaster's financial situation was further strained because Kindsvater, interpreting the contract differently than Feaster, had failed to discharge the indebtedness in excess of $222,660.95 on the trucks and trailers.

In January 1968 the Kansas court ruled that Kindsvater's fear of Feaster's insolvency did not justify a refusal to perform on the contract, and ordered Kindsvater to deliver the certificates of title. Unable now to reverse its financial situation, Feaster sold all of its assets. Proceeds of the sale enabled it to pay off some bank debts, equipment contracts, and tax claims, but debts totaling $127,381.53 remained outstanding. It then filed for bankruptcy. Kindsvater, which had meanwhile reentered the livestock transport business, filed claims in the bankruptcy court against Feaster, based on the promissory notes it held. Feaster counterclaimed for damages caused by alleged breaches of contract and fraud.

The referee in bankruptcy found that Kindsvater had purposefully breached the contract, and that the breach in question was in violation of the Kansas statutory law. He awarded Feaster $156,696.-99 in actual and punitive damages, permitting Kindsvater to set off the amounts to which it was entitled under the contract, i. e., the $12,720 rental and the $50,339.05 note, leaving Feaster with a net recovery of $93,637.94, plus court costs. The District Court affirmed the judgment rendered by the referee, and both the parties have appealed.

Kindsvater's first argument on appeal is that the court improperly interpreted the contract as requiring it to pay off all indebtedness on the trucks and trailers in excess of $222,660.95. If this contention is meritorious, the damages awarded to Feaster would have to be reduced by $32,396.99, since the trial court found it to be damaged in that amount as a result of Kindsvater's breach.

At the pretrial conference the parties, as noted above, agreed that the amount necessary to fully discharge the contracts on the equipment as of March 9, 1967, was $255,057.94. Kindsvater contends that the net balance of the security agreements as of March 9, 1967, was $222,660.95, and that the remaining $32,-396.99 consisted of credit life insurance and finance charges which were added to allow payment to the secured parties over an extended period.

We must hold that the trial court's finding is supported by substantial evidence and the construction of the contractual provision is proper. The terms of the contract are plain and clear, and its meaning is so revealed, and additional words cannot be read into the agreement which import an intent unexpressed when it was executed. Wood v. Hatcher, 199 Kan. 238, 428 P.2d 799.

Appellant's second argument on appeal is essentially that the extent of the injury if any to appellee's business was too uncertain to be accurately measured and, therefore, damages should not have been awarded. To support this contention, appellant cites the testimony of a number of witnesses heard by the referee who indicated in one way or another that the proximate cause of the failure of Feaster's business was his own mismanagement. Kansas cases are cited which hold that before one may recover damages for loss of profits to an established business occasioned by the wrongful acts of another, it must be made to appear that the business had been in successful operation for such period of time as to give it permanency and recognition, and that it was earning a profit which may be reasonably ascertained or approximated. See Avery v. City of Lyons, 183 Kan. 611, 331 P.2d 906.

In his memorandum opinion, the referee calculated the damages to be awarded on the basis of the net earnings that reasonably might have been expected from the operation by Feaster of the fifteen trucks and seventeen trailers it was forced to sell in February 1968. This is supported by the testimony of a witness who was familiar with the Feaster company and with the cattle hauling business generally. He testified that but for the sale of its trucks and trailers, Feaster would have experienced an average annual gross of $3,500 to $5,000 per month; that the average net profit during the first three calendar quarters would have been from four per cent to five per cent of gross; and that an eight per cent to ten per cent net would have been experienced in the last calendar quarter. The referee based his award on this testimony, apparently believing that despite past financial setbacks, the Feaster Trucking Company would have shown a profit for 1968, had it been able to continue its operations. This is sufficient to support the finding, as the purpose of the rule in Avery v. City of Lyons, 183 Kan. 611, 331 P.2d 906, is to prevent the award of damages in cases where the degree of the injury is highly speculative. See also States v. Durkin, 65 Kan. 101, 68 P. 1091 (1902), but the record before us does not disclose such a case. See also American National Bank v. Bartlett, 40 F.2d 21 (10th Cir. 1930); Fish v. East, 114 F.2d 177 (10th Cir. 1940); Washington v. Houston Lumber Co., 310 F.2d 881 (10th Cir. 1962). Accordingly, the awarding of actual damages in this case was proper.

Appellant's final argument is that the assessment of punitive damages was improper. As to this point, the referee found that in failing to transfer the certificates of title on the effective date of the sale to Feaster Trucking Service, Inc., appellant not only breached the contract, but it also was a fraud. The appellee as to this point relies on Gurley v. Broadway Sales Co., 184 Kan. 179, 334 P.2d 312, wherein it was held that a violation of K.S.A. 8–135 constitutes fraud for purposes of determining whether a separate limitation period for suits based on fraud will apply. It is a reasonable construction of the statute and Kansas decisions that a violation of the statute is fraudulent under the rule referred to in Worden v. Tri-State Ins. Co., 347 F.2d 336 (10th Cir. 1965). Thus, it would be proper to hold that punitive damages are available in cases characterized by this "fraud." The referee awarded punitive damages and properly so. There has been no question raised as to the propriety of the referee in awarding the relief sought.

*The Cross Appeal:*

Not mentioned in our recitation of the facts of this case is a "distress sale" of equipment by Feaster in September 1967. This sale of eight trucks and seven trailers at public auction, which yielded about one-half of what was anticipated, was found by the referee to have been necessitated by general business conditions, and not by Kindsvater's breaches of contract. Consequently, the "losses" Feaster absorbed in this sale were not included in the referee's assessment of damages.

Feaster contends, on cross appeal, that it received $68,905 less than the fair value of the equipment from this sale, and lost profits which these units would have earned prior to December 1, 1967, of $12,000. It is argued that Kindsvater's failure to pay the $32,396.99 in security interests on the equipment sold, which failure forced Feaster to assume this burden itself, was the proximate cause of the 1967 distress sale, and the $80,905 loss from that sale is therefore claimed to be directly attributable to Kindsvater's breach of contract.

The referee, in his findings of fact, addressed himself to the 1967 sale and the losses Feaster sustained therein, stating that "Feaster did not blame Kindsvater for his cash shortage insofar as it was attributable to his bad debt losses in Phoenix and the evidence shows Feaster did not openly voice complaints about Kindsvater's failure to pay down the contract balances until December of 1967." The referee concluded: "The

loss resulting from the September 1967 sale cannot reasonably be attributed to Kindsvater." This finding is supported by the evidence. Feaster did not provide the referee with evidence to establish how much his monthly installment payments would have been reduced had Kindsvater paid the holders of the security interests the $32,396.99. It was thus not shown with reasonable certainty that any damage resulted from the act complained of. While it is clear that Kindsvater's persistent refusal to pay $32,396.99 eventually amounted to an actionable breach of contract, it is not clear that its failure to make the payment had the consequences the appellee here urges.

Feaster also contends on cross appeal that the referee should have considered litigation expenses, which were caused by Kindsvater's wrongful acts, in assessing punitive damages. Cross-appellant cities Brewer v. Home-Stake Production Co., 200 Kan. 96, 434 P.2d 828, as standing for the rule that litigation expenses, including attorneys' fees, are to be considered as an element of punitive damages in Kansas. Kindsvater's response is that the rule in Brewer is not mandatory, but whether to consider litigation expenses in assessing punitive damages is left to the court's discretion.

The referee, of course, did award punitive damages in the amount of $15,000. Although he states as a finding of fact that there was no proof of the amount of suit expenses in the Kansas state court, he does not say that he therefore declined to estimate reasonable litigation expenses for that case and this one in arriving at the $15,000 figure. In his memorandum opinion the referee cites Brewer as justifying the $15,000 assessment. We must therefore assume that the referee understood that case to empower him to estimate litigation expenses.

█ Cross-appellant's final contention is that interest on the judgment should be eight per cent rather than the six per cent awarded by the referee. It is correctly pointed out that effective July 1, 1969, interest on judgments in Kansas was raised from six per cent to eight per cent (K.S.A. 16–204), that the referee's judgment was entered after the effective date, and that interest in federal district court judgments must be calculated from the date of the entry of the judgment at the rate allowed by state law. 28 U.S.C. § 1961. Kindsvater simply points out that this issue was waived by cross-appellant when it failed to raise it in its petition for review of the referee's order. In Clinton v. Joshua Hendy Corp., 264 F.2d 329 (9th Cir. 1959), the court held that the plaintiff waived his right to interest entirely when his contention that he was entitled to interest was raised for the first time in his assignment of error on appeal. We hold that cross-appellant waived its right to eight per cent interest when it failed to raise the claim in its petition for review.

The judgment of the District Court is affirmed.