**OMAN CONSTRUCTION COMPANY**

v.

**TENNESSEE VALLEY AUTHORITY.**

No. 79–3098–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

Dec. 13, 1979.

George E. Copple, Jr., Nashville, Tenn., for plaintiff.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Asst. Gen. Counsel, Thomas C. Doolan, Tennessee Valley Authority, Knoxville, Tenn., for defendant.

### MEMORANDUM

MORTON, Chief Judge.

This suit was brought in the Chancery Court of Davidson County, Tennessee, by Oman Construction Company ("Oman" or "Contractor") against the Tennessee Valley Authority ("TVA") seeking to set aside a Hearing Officer's final administrative decision rendered pursuant to the *Disputes* provision of a contract between the parties denying Oman's claim for increased compensation for taxes and insurance costs in the amount of $2,952.82.[1]

The facts are not in dispute and are summarized as follows:

On April 22, 1974, following competitive bidding, TVA awarded a contract (TVA Contract No. 74C53–94171–1) to Oman for the construction of new approaches for a railroad bridge across the Little Tennessee River.[2] The work, which has now been completed, was to be performed for a fixed price of $838,491.40, with Oman furnishing all labor and materials. The contract required Oman to pay for labor used in performing the contract at rates not less than those specified in the minimum wage and fringe benefits schedule of the contract (form TVA 1851, app. 96).[3] The minimum wage and fringe benefit schedules are generally revised annually by TVA. The contract provided, under the Field Labor Cost Adjustment provision, for cost adjustments based on changes made in the "wage rate or related benefits *listed in the minimum wage schedule*" (app. 113).[4] The revised schedules are incorporated in the contract.

On December 10, 1975, Oman submitted an invoice to TVA seeking a price adjustment under the Field Labor Cost Adjustment provision for the years 1974 and 1975 because of increases in the minimum wage rates and related benefits listed in the minimum wage schedules for those years. The invoice also included a claim for $2,952.82 for increased FICA taxes, state and federal unemployment taxes, public liability and property damage insurance, and workmen's compensation insurance costs which Oman claimed it incurred as a result of the revised TVA wage schedules. The amounts billed for increases in the minimum wage rates and for related benefits listed in the minimum wage schedule were paid by TVA in accordance with the Field Labor Cost Adjustment provision of the contract. However, on March 31, 1976, the contract purchasing agent denied Oman's claim for increased taxes and insurance costs as not

---

1. TVA removed the action to this court pursuant to the provisions of 28 U.S.C. § 1441 (1976). The court thus has jurisdiction pursuant to such removal and 28 U.S.C. § 1331.

2. The entire administrative record of the proceedings before the Hearing Officer is annexed as an appendix to TVA's answer in this action. References to the appendix will hereinafter be designated as "app. ———."

3. *See* Special Conditions, *Wage Rates and Classifications* (app. 88). The minimum wage provision is required by section 3 of the TVA Act

(16 U.S.C. § 831b (1976)), which provides, in pertinent part, that: "All contracts to which the Corporation is a party and which require the employment of laborers and mechanics in the construction, alteration, maintenance, or repair of buildings, dams, locks, or other projects shall contain a provision that not less than the prevailing rate of wages for work of a similar nature prevailing in the vicinity shall be paid to such laborers or mechanics."

4. *See* p. 379, *infra.* Emphasis added unless otherwise noted.

reimbursable under the contract. Oman, by letter of June 14, 1977, requested a contracting officer's decision under the *Disputes* clause of the contract (General Conditions, § 16, *Disputes*, app. 94) to resolve the matter.

On August 8, 1977, the Contracting Officer rendered a decision denying Oman's claim on the ground that the taxes and insurance costs were not "related benefit[s] listed in the minimum wage schedule" and were, therefore, not reimbursable under the Field Labor Cost Adjustment provision. By letter dated September 1, 1977, in accordance with the *Disputes* clause of the contract, Oman appealed the Contracting Officer's decision to TVA's General Manager (app. 36) who appointed a Hearing Officer, Kenneth D. McCasland, Sr., to hear and decide the dispute (app. 32–33).

In the appeal, the parties agreed that no material facts were in dispute in regard to liability, and that the issue of liability was suitable for disposition by summary judgment without a factual hearing (app. 1, 6, 16, 26–28, 31). The dispute was accordingly submitted for resolution by the Hearing Officer on the basis of the briefs of the parties and pertinent documents which had been submitted to the Hearing Officer.[5] On March 2, 1978, the Hearing Officer denied Oman's claim and granted summary judgment in TVA's favor, holding that the contract provisions "do not specifically require payment of taxes and insurance cost burdens and . . . do not require or permit payment of the Oman claim for such items in the amount of $2,952.82" (app. 4).

Oman brings this suit to recover the amounts claimed for increased taxes and insurance costs, contending that the decision of the Hearing Officer is contrary to law. This action is before the court on TVA's motion for judgment on the pleadings or, alternatively, for summary judgment. As in the administrative disputes proceeding, there are no material facts in dispute.

The contract involved in this case provides for administrative resolution of all disputes arising out of or connected in any way with the performance of the parties under the contract (General Conditions, § 16, *Disputes*, app. 94). The *Disputes* provision states in pertinent part:

> The decision of the General Manager or his representative or representatives shall be final and conclusive upon the parties except on questions of law or unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence . . . .[6]

The court's role in a contract dispute proceeding like this one is not de novo; rather, as the Supreme Court has stated, "[t]he court performs principally a reviewing function." *Crown Coat Front Co. v. United States*, 386 U.S. 503, 513, 87 S.Ct. 1177, 1183, 18 L.Ed.2d 256 (1967). Moreover, in reviewing a final administrative decision, the court is restricted to the administrative record. *Crown Coat Front Co. v. United States, supra.* Thus, "apart from questions of fraud, determination of the finality to be attached to a departmental decision on a question arising under a 'disputes' clause must rest solely on a consideration of the record before the department." *United States v. Carlo Bianchi & Co., supra,* 373 U.S. at 714, 83 S.Ct. at 1413. Although the hearing officer's interpretation of the contract, as a question of law, is not binding on the court under the disputes provision,

---

**5.** See note 2, *supra.*

**6.** Such disputes clauses and the decisions rendered thereunder have long been approved and enforced by the courts. *See, e. g., United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *Patton Wrecking & Dem. Co. v. Tennessee Valley Authority,* 465 F.2d 1073, 1076 (5th Cir. 1972); *Tennessee Valley Authority v. U. S. Carbon*

*Prods., Inc.,* 427 F.Supp. 474, 478 (E.D.Ill.1976). In fact, this court recently granted TVA judgment on the pleadings and enforced a hearing officer's decision rendered under a disputes provision identical to the one here. *Tennessee Valley Authority v. McCann Steel Co.,* No. 77–3520–NA–CV (May 10, 1978), *appeal docketed,* No. 78–1350 (6th Cir. Aug. 9, 1978).

that administrative interpretation is to "be given careful consideration and accorded great respect." *George Hyman Constr. Co. v. United States*, 564 F.2d 939, 944 (Ct.Cl. 1977); *accord, Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 1185, 201 Ct.Cl. 56 (1973); *Winston Bros. Co. v. United States*, 458 F.2d 49, 54, 198 Ct.Cl. 37 (1972).

TVA's motion here, as in the proceeding before the Hearing Officer, presents for determination the single issue of the proper interpretation of the Field Labor Cost Adjustment provision of the contract. That provision provides in pertinent part:

The TVA minimum wage schedule (form TVA 1851) usually is revised around the first of each calendar year to reflect changes in the prevailing rates of wages and related benefits. If any revisions are made by TVA which are applicable to the minimum wage schedule attached to this contract between the date of contractor's bid and the date stipulated for completion of the contract, or any extension thereof authorized by TVA in accordance with the "Delays and Remedies" provision, the contract price shall be increased or decreased to reflect such revisions as follows:

(a) For each classification actually used in work on the contract and with respect to which a revision is made in the wage rate *or related benefits listed in the minimum wage schedule*, the number of man-hours worked during the period in which such revision is effective shall be determined from the certified payrolls submitted by the contractor or its subcontractor; and the increase or decrease in the respective wage rate or benefit shall be applied to this number of man-hours. The contract price shall be increased or decreased by the total net amount resulting from all such changes under the various classifications in the schedule. This labor cost adjustment shall be made regardless of the level of wage rates and other benefits actually paid by the contractor or subcontractor, either before or during the period of work under this contract.

. . . . .

(c) This provision is applicable only to work which is subject to the TVA minimum wage schedule (form TVA 1851) and this provision is in lieu of all other adjustments for changes in labor costs [app. 113].

■ The question presented is whether the above provision allows Oman a price adjustment for increased FICA taxes, federal and state unemployment taxes, public liability and property damage insurance, and workmen's compensation insurance which may have resulted from increases in the minimum wage and related fringe benefits schedule. The Hearing Officer correctly and unequivocally answered this question in the negative, stating:

The field labor cost provision as included in the contract (quoted previously) and as applied to the TVA minimum wage schedule as revised (form TVA 1851) deals with increases or decreases in compensation payable to the contractor with respect to revisions made in the wage rate or related benefits listed in the minimum wage schedule. The wage rates are specifically shown as hourly rates applicable to the various classifications of employees by craft. The "related benefits listed in the minimum wage schedule" are transportation allowances, contributions to health and welfare funds or programs, and pension benefit funds (Schedule A Construction Work . . . Part 2. Minimum Fringe Benefits). These are the type of benefits commonly contained in wage negotiation agreements between contractors and crafts in the construction industry. Nowhere in the field labor cost provision, the minimum wage schedule or the wage rates and classifications provision is any reference express or implied to be found relating to payment by TVA under these provisions of taxes or insurance costs [app. 4].

The Hearing Officer's decision denying Oman's claim for increased taxes and insurance costs is clearly correct. Oman's contention to the contrary ignores the plain

language of the adjustment provision itself as well as other provisions of the contract, which make it clear that not all increased labor costs would be reimbursable under the contract.

By its express terms, the Field Labor Cost Adjustment provision limits price adjustments for labor costs exclusively to cover revisions "in the wage rate or related benefits *listed in the minimum wage schedule*" (app. 113). The purpose of the Field Labor Cost Adjustment provision is not to allow the contractor to pass through any labor-related cost increases incurred after the bid date, but only to adjust the contract price to reflect revisions in TVA's minimum wage schedule between the bid opening and the contract completion dates.[7] Thus, the adjustment provision states that "[t]his labor cost adjustment shall be made regardless of the level of wage rates and other benefits actually paid by the contractor . . . ." The "related benefits" listed in the minimum wage schedule (form TVA 1851) are limited to the following "[m]inimum fringe benefits—transportation allowances, contributions to health and welfare funds or programs, and pension benefit plans" (app. 104). The schedule does not mention unemployment taxes, FICA taxes, liability or property insurance costs, workmen's compensation insurance costs, or any other indirect labor costs which might be incurred by a contractor.[8]

The Hearing Officer's decision that a price adjustment for taxes and insurance is not allowable under the contract as a result of increases in the minimum wage and fringe benefit schedule is further confirmed by the method of calculating the price adjustment set forth in the Field Labor Cost Adjustment clause itself. It provides that the contractor is entitled to payment of the "total net amount resulting from all such *changes* under the various classifications *in the schedule.*" Subsection (c) of the Field Labor Cost Adjustment clause provides further that this provision "is in lieu of all other adjustments for changes in labor costs" (app. 113). These sections of the contract, which embody all of the procedures for labor cost adjustments, do not authorize payments for the cost items claimed by the contractor, and they are therefore not recoverable.

This interpretation is consistent with other provisions of the contract. As previously stated (*see* note 8 *supra*), in requiring the contractor to pay for labor at the minimum specified rate, the contract provides that "TVA makes no representation that the bidders will be able to employ labor at such rates and the bidders must determine for themselves the rates which they would have to pay for labor in performing this contract" (Special Conditions, *Wage Rates and Classifications*, app. 88). Moreover, the contract Special Conditions entitled *Insurance* (app. 89) and *State and Local Taxes* (as revised in addendum No. I to the invitation, app. 229) put the contractor on notice that it should include the costs of all applicable state and local taxes and workmen's compensation insurance in its bid. Here, Oman seeks, in effect, to obtain indirectly under the Field Labor Cost Adjustment provision compensation for costs which specific provisions of the contract made his responsibility.

■ Simply stated, the contract terms which Oman voluntarily accepted permitted

---

7. The primary purpose for including the minimum wage schedules in the contract is to implement the congressional policy set forth in section 3 of the TVA Act (16 U.S.C. § 831b (1976)) to protect workers from substandard earnings. A similar provision of the Davis Bacon Act (40 U.S.C. § 276a (1976)) has been held to be for the benefit of the workers and not the contractor. *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594 (1954).

8. Those costs are clearly the bidder's responsibility to anticipate and include in his bid. As stated in the contract Special Condition entitled *Wage Rates and Classifications* (app. 88): "The wage rates shown in form TVA 1851, Schedule of Trades and Labor Classification, are the minimum rates that may be paid for work on this contract. TVA makes no representation that the bidders will be able to employ labor at such rates and the bidders must determine for themselves the rates which they would have to pay for labor in performing this contract."

TVA to increase the minimum wage rate required to be paid to workers. No guarantee was given that laborers could be employed at this rate or that additional non-reimbursable costs would not be incurred. TVA's only obligation in this regard was to reimburse the contractor in the manner agreed upon for changes it made in the minimum wage schedules. The contract is explicit as to the direct labor costs which may form the basis for price adjustments and does not include the indirect labor costs (taxes and insurance) which Oman claims are "related" to the wages and benefits listed in the schedules. In such circumstances there is no need to look beyond the plain language of the contract in search of some other intention, nor should additional words be read into the contract, as Oman seeks to do. *See Feaster Trucking Serv., Inc. v. Kindsvater, Inc.,* 460 F.2d 180 (10th Cir. 1972); *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.,* 400 F.2d 465 (5th Cir. 1968); *Plymouth Mut. Life Ins. Co. v. Illinois Mid-Continent Life Ins. Co.,* 378 F.2d 389 (3d Cir. 1967). Indeed, Oman's interpretation of the contract can be upheld only by rewriting the agreement of the parties to eliminate from the contract price adjustment provision the words "listed in the minimum wage schedule." The court knows of no principle or authority which would support so drastic a result, nor does it think such a result can be justified.

■ Without having raised this issue before the Hearing Officer, plaintiff now asserts that its alleged increased costs for FICA taxes and federal unemployment taxes are reimbursable under a provision of the Federal Procurement Regulations (brief at 3–4). The regulation it quotes, however, is neither "required," as it asserts, nor even applicable to the facts here by plaintiff's own admission.

The regulatory clause which plaintiff cites is based on the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471 *et seq.* (1976), which is a general statute governing procurement for those parts of the government subject to it.

*See* 41 C.F.R. § 1–1.003 (1978). TVA's procurement, on the other hand, is governed by section 9(b) of the TVA Act, 16 U.S.C. § 831h(b) (1976), which is "TVA's procurement statute." *G F Business Equip., Inc. v. Tennessee Valley Authority,* 430 F.Supp. 699, 703 (E.D.Tenn.1975), *aff'd,* 556 F.2d 581 (6th Cir. 1977). Section 9(b) expressly provides that:

> The Corporation shall determine . . . the forms and contents of its contracts and other business documents except as otherwise provided in the Tennessee Valley Authority Act of 1933, as amended [55 Stat. 776 (1941)].

The regulations plaintiff relies upon are not based on or under section 9(b). To the contrary, they are expressly issued under the Federal Property and Administrative Services Act of 1949, and expressly apply only "to the extent specified in the Federal Property and Administrative Services Act of 1949" (41 C.F.R. § 1–1.004 (1978)). Section 602(d)(12) of that Act specifically recognizes TVA's statutory independence in its purchasing by providing that "[n]othing in this Act shall impair or affect any authority of . . . the Tennessee Valley Authority" in its procurement. 63 Stat. 401–02 (1949), *as amended,* 40 U.S.C. § 474(12) (1976). *See Inryco, Inc. v. Tennessee Valley Authority,* 471 F.Supp. 59, 61 (E.D.Tenn. 1978). TVA is thus expressly exempted from the statute and the regulations.

TVA has also not adopted the regulation. Section 602(d)(12), *supra,* also authorizes TVA to coordinate its procurement with the Act "to the maximum extent that it (TVA) may deem practicable, consistent with the fulfillment of the purpose of its program and the effective and efficient conduct of its business" (*id.*). In exercising the discretion thus expressly vested in it, the TVA Board of Directors has determined that its procurement "shall not be subject to the Federal Procurement Regulations." TVA clearly does not and is not obligated to conduct its procurement by using the clause plaintiff cites.

■ In any event, that clause is wholly irrelevant here. By its very terms it ap-

plies only when "a statute, court decision, written ruling, or regulation *takes effect after the contract date*." Plaintiff admits in its brief (at 1–2) that the alleged increased costs which it incurred "were *not new levies* by the taxing authorities," and further states "this situation is *not one* in which Congress changed the taxes." The taxes for which plaintiff now seeks reimbursement were in effect at the time this contract was executed. There simply was no statute, court decision, written ruling, or regulation which took effect thereafter which would allow plaintiff to make a claim under that regulation, even if it applied.

■ Plaintiff further contends that the contract adjustment provisions are ambiguous and seeks to have them construed against TVA. However, there is no ambiguity here, and thus no room for that principle to apply.

We have noted that the adjustment provision applies only to revisions in "the wage rate or related benefits listed in the minimum wage schedule." The minimum wage schedule lists the precise *wage rate* to be paid to each of the categories of laborers and craftsmen employed on the project (app. 97 *et seq.*). It designates the minimum *fringe benefits* which must be paid to each classification of employee and the *precise amount* to be paid for each *designated benefit* (app. 104 *et seq.*). Thus, it specifies to the penny the wage rates and amount of benefits to be paid. If the *amounts specified* in the minimum wage schedule are increased or decreased, an adjustment in the contract price is made accordingly. It is difficult to conceive of a less ambiguous provision.

■ Plaintiff is now unhappy with the provision and offers an "interpretation" different than the meaning of its plain language. However, ambiguity does not arise in a contract merely because the parties may differ as to the interpretation of certain of its provisions. *Foote Mineral Co. v. Maryland Cas. Co.*, 173 F.Supp. 925 (E.D. Tenn.1959), *aff'd*, 277 F.2d 452 (6th Cir.) *cert. denied*, 364 U.S. 818, 81 S.Ct. 49, 5 L.Ed.2d 48 (1960); *Tri-Cor, Inc. v. United*

*States*, 458 F.2d 112, 126, 198 Ct.Cl. 187 (1972). Where, as here, the clear contract language itself reveals the intent of the parties, there is no need to apply rules of construction. *Pavlik v. Consolidation Coal Co.*, 456 F.2d 378, 380 (6th Cir. 1972); *Standard Title Ins. Co. v. United Pac. Ins. Co.*, 364 F.2d 287, 289 (8th Cir. 1966). As the Court of Claims has stated:

> Where a contract read as a whole is amenable to only one reasonable construction, we have no need for application of rules for the resolution of ambiguities against the drafter [*Framlau Corp. v. United States*, 568 F.2d 687, 692 (Ct.Cl.1977)].

In such a case, "additional words cannot be read into the agreement which import an intent unexpressed when it was executed." *Feaster Trucking Serv., Inc. v. Kindsvater, Inc.*, 460 F.2d 180, 182 (10th Cir. 1972).

The minimum wage schedule involved here is clear and specific as to both the "wage rate" and the "related benefits" to be paid by the contractor and which will be reimbursable if increased. The taxes and insurance costs claimed by plaintiff are simply not within either specified category and are not reimbursable under the contract.

■ Finally, plaintiff attempts to make an issue out of the fact that TVA had the right to reject nonresponsive bids, contending that "the bidding contractors *cannot* negotiate with TVA" (emphasis in original). We do not see the relevance of this assertion. This was a formally advertised contract awarded under section 9(b) of the TVA Act after competitive bidding. By its very nature such a contract is not subject to negotiation if all bids are to be considered on an equal basis. Plaintiff was under no obligation to bid on this contract at all. It did so voluntarily with full knowledge of the terms and conditions on which TVA wished to deal. In actuality, plaintiff had the "absolute bargaining power" by its unlimited discretion to refrain from bidding at all if it objected to the terms of the invitation. *See, e. g., Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940); *Tennessee Valley Au-*

*thority v. Lenoir City*, 72 F.Supp. 457, 461 (E.D.Tenn.1947). Having voluntarily bid on and been awarded the contract, plaintiff is fully bound by its provisions.

TVA's motion should be granted, and plaintiff's cross-motion should be denied. An appropriate order will be entered.