66 F.3d 339
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 WHITE MARTIN AND ASSOCIATES, Plaintiff-Appellant,
v.
KANSAS CITY POWER AND LIGHT, Defendant-Appellee.
 No. 94-3258.
 United States Court of Appeals, Tenth Circuit.
 Sept. 1, 1995.
 
 1
 Before McKAY and ANDERSON, Circuit Judges, and COOK*, Senior District Judge.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 H. DALE COOK, Senior District Judge.
 
 
 4
 White Martin and Associates (White Martin), an engineering firm, appeals from a judgment n.o.v. (in part) denying lost profits awarded to it by a jury from Kansas City Power and Light (KCPL). The District Court denied such profits as neither reasonably certain nor the natural and probable result of the defendant's negligence.
 
 
 5
 White Martin's claim arose from its direct and indirect communications with KCPL related to work White Martin was doing for the developer of a Pace store in Roeland Park, Kansas. At the time Pace was owned by K-Mart Corporation (K-Mart). White Martin alleged and the jury found that KCPL was negligent in failing to timely disclose to White Martin the existence of some underground power lines on the site of the Pace store. The jury also found White Martin 38% responsible for its failure to discover the underground power lines until March of 1991. White Martin claimed damages for additional work and for lost profits caused by the error.
 
 I. RELEVANT FACTS AND EVIDENCE
 
 6
 James Hill, K-Mart's Chief Engineer, characterized the failure to earlier discover the power lines as a "major error in the survey work." [Aplee.Appx. 101] He said that he had been advised by John White and others at White Martin that the firm had relied strictly on KCPL utility drawings and its people "had not done any further in-depth investigation on their own other than looking at record drawings."[1] [Aplee.Appx. 103] He further testified that this error "would make [K-Mart] very wary of using [White Martin's] services on other projects ... because of the magnitude of the error." [Aplee.Appx. 102] Hill said that about 60% of all K-Mart projects were handled by developers and that 40% were handled in-house. On some projects K-Mart had "a need to use outside professional services ... and [would] seek and commission outside engineers to provide those services." [Aplee.Appx. 104] Hill continued, "So we are constantly looking for additional professional help or at least to recognize professionals around the country that would assist us on projects on an as needs basis." [Aplee.Appx. 104]
 
 
 7
 When asked his opinion about White Martin working on future K-Mart projects Hill said,
 
 
 8
 "If they were proposed by the developer, as was done on that particular project, we probably would not have an objection because that is his responsibility. I can't speculate as to whether we would even suggest to him that they had made an error on another project we were involved in.
 
 
 9
 As far as K-Mart hiring John White and his people, we would have to have a good feeling that this was an error that had occurred, why it had occurred and what his firm had seen to do to change their operation so that such a problem did not occur in the future."
 
 
 10
 [Aplee.Appx. 104-105] Joseph Walters, a developer who worked on the Roeland Park project, testified that K-Mart in the last several years has "gone back to mostly self-development." [Aplt.Appx. 104]
 
 
 11
 Hill also testified that K-Mart had recently sold all of its Pace stores to Wal-Mart and that K-Mart would not have any new Pace projects such as the one White Martin worked on at Roeland Park. He also compared K-Mart's construction activity in recent years to a sine wave. He elaborated on this comparison as follows:
 
 
 12
 "Well, [a sine] wave is high points and low points. And I would say that five years ago [late 1988] we were beginning on a high point and were on a high point for a couple, three years [until late 1990-late 1991]. And then for maybe two years we were into our relatively low point. We're just coming out of that as far as number of stores being developed and number of stores being expanded [as of December 1993].
 
 
 13
 Five years ago when we started our renewal program approximately eight to nine hundred stores were identified as being stores that required expansion because they did not have the size required to fit today's market place. We did a major expansion of about 300 of those stores and then stopped to take a look and see if the investment was worth the return--or if the return on the investment was worthwhile.
 
 
 14
 So that's when we got into this--the last couple of years [1992 and 1993] have been the lower side of the [sine] wave, where the K-Mart construction, Pace construction has somewhat slowed down."
 
 
 15
 The testimony of John White established that White Martin had the following receipts from K-Mart related work:
 
 
 16
 1989 $14,549
1990 $38,206
1991 $283,934
1992 $68,478
1993 $9,300
 
 
 17
 [Aplt.Appx. 80] John White said he became concerned when he realized that after the Roeland Park incident his only K-Mart related work consisted of pre-existing projects. There was no new K-Mart work. He contacted James Hill and discussed the incident and his firm's relationship with K-Mart and was told that K-mart was questioning his firm's ability to do the kind of work that was done at Roeland Park because of the error there. [Aplt.Appx. 78]
 
 
 18
 The K-Mart related work that White Martin did perform was primarily for developers, not on contract with K-Mart directly. [Aplt.Appx. 36 and 97] Joseph Walters said that K-Mart dealt with developers they knew and had experience with. He was once advised by Dennis Eskie, a K-Mart developer, that the way to get a contract with K-Mart was to deal with architects and engineers that K-Mart was familiar with so as to get approved. [Aplt.Appx. 116]
 
 II. THE DISTRICT COURT OPINION
 
 19
 The District Court requested a special verdict from the jury specifying the precise amount of lost profits awarded so that the Court could review the sufficiency of the evidence on each form of damages awarded after the verdict was entered. In support of its decision to enter judgment n.o.v. for the defendants on lost profits the Court held as follows:
 
 
 20
 1. The evidence failed to show any loss of profit on the Pace facility in Roeland Park.
 
 
 21
 2. The evidence failed to show any particular contract or work which White Martin failed to receive as a result of KCPL's negligence.
 
 
 22
 3. White Martin had no contract or history for provision of exclusive or even a minimum level of services for K-Mart or of any further projects for which White Martin might have been eligible.
 
 
 23
 4. "Unrefuted evidence" demonstrated that K-Mart would neither decline nor veto the retention of White Martin after and because of the Roeland Park incident.
 
 III. ANALYSIS
 
 24
 The standard of review for the grant or denial of a motion for judgment n.o.v. is the same as is employed by the trial court. Judgment n.o.v. is proper only when the evidence so strongly supports an issue that reasonable minds could not differ. Further, in reviewing a judgment n.o.v. we must view the evidence in the light most favorable to the party opposing the decision and give that party the benefit of all reasonable inferences from the evidence. Trujillo v. Goodman, 825 F.2d 1453, 1456 (10th Cir.1987).
 
 
 25
 Although a number of issues have been raised by the appellants we need reach only the issue whether the proof of lost profits was sufficiently certain to create a jury question under Kansas law.[2] We hold that the evidence was not sufficiently certain; the decision below may be affirmed on that ground alone.
 
 
 26
 The District Court correctly cited Billups v. American Surety Co., 251 P.2d 237, 240 (Kan.1952) for the proposition that "there may be recovery for loss of profits consequent upon tort if they are such as may naturally be expected to follow from the wrongful act and if they are certain, but there may be no recovery where the profits are uncertain, speculative or remote."
 
 
 27
 As the District Court correctly observed, there was no evidence of any specific contracts that White Martin would have or even could have obtained but for the negligence of KCPL. The plaintiff in its brief on appeal did not cite any such references in the record and at oral argument was unable to give an example of any contract that White Martin even might have obtained otherwise. Our review of the transcripts of testimony presented on appeal has disclosed no such evidence. Accordingly, we will consider whether White Martin, through more general evidence of lost profits, has proven such with sufficient certainty.
 
 
 28
 Although White Martin's petition[3] alleged that the Roeland Park incident caused a loss of credibility of White Martin which affected the ability of the firm to solicit future business contracts generally, the evidence of a casual link to the plaintiff's business receipts was exclusively related to the disaffection of K-Mart. If White Martin failed to show loss of K-Mart business to a sufficient degree of certainty it failed to show any loss of business to a sufficient degree of certainty. Bearing this in mind we now turn to the question whether White Martin proved a loss of revenue from K-Mart related contracts to a sufficient degree of certainty.
 
 
 29
 White Martin contends that the evidence did, with sufficient certainty, show a loss of profits caused by the Roeland Park incident. It points not only to the statistics on its revenues from K-Mart related projects, listed above, but also the following circumstances:
 
 
 30
 1. K-Mart favors developers who use engineers K-Mart is familiar with.
 
 
 31
 2. An engineering firm that satisfies K-Mart is likely to receive more work.
 
 
 32
 3. Prior to Roeland Park K-Mart was satisfied with White Martin's work and White Martin was "consistently" receiving work from developers on K-Mart projects.
 
 
 33
 4. K-Mart expressed dissatisfaction with White Martin's failure to determine the existence of a power line at the Roeland Park location.
 
 
 34
 5. White Martin received no further work on K-Mart projects after Roeland Park.
 
 
 35
 6. White Martin was profitable for years before the Roeland Park project and was not afterward.
 
 
 36
 White Martin further alleges that K-Mart was increasing construction activity when White Martin failed to receive further contracts. However, the testimony of James Hill indicates that the construction activity was primarily sloping downward throughout the years of 1992 and 1993, following the Roeland Park project. The evidence also indicates that K-Mart was handling more projects in-house and that White Martin had never received much of this kind of business.
 
 
 37
 Against this backdrop we examine the statistics relating to the decline in K-Mart related business. Although it is true that White Martin received no new K-Mart related work after the Roeland Park incident and its receipts dropped sharply in the following years there are a number of possible explanations for this sharp drop and the numbers show almost as sharp a rise to an extraordinary peak in the year 1991, which peak White Martin would like to use as the benchmark for calculation of damages in all future years. The defense characterization of this as a one year "spike" is not much of an exaggeration.[4]
 
 
 38
 We do not mean, by these comments, to suggest that the plaintiff's claim of damage is clearly without foundation or that it was brought in bad faith. The plaintiffs have shown that it is possible they were damaged by the Roeland Park incident, but they bear the burden to show more than a mere possibility. They must show lost profits with reasonable certainty before they can even present the question to the jury. The revenues from K-Mart business upon which their case hinges do not have a long history nor have they been fairly consistent or predictable. In addition, the total number of K-Mart related contracts mentioned in the record on appeal, although somewhat vaguely described, do not appear to number much more than ten or fifteen with many constituting a small amount of preliminary work. Statistically speaking, such a small number of contracts increases the possibility of fortuitous circumstances affecting a small number of projects causing large fluctuations in revenues.
 
 
 39
 The limited number of large construction contracts distinguishes this case from cases on retail stores and the like, such as Avery v. City of Lyons, 331 P.2d 906 (Kan.1958), Kearny v. Kansas Public Service, 665 P.2d 757 (Kan.1983) and the case that came before us relating to lost business from the operation of fifteen trucks and seventeen trailers in Feaster Trucking Service, Inc. v. Kindsvater, Inc., 460 F.2d 180 (10th Cir.1972).
 
 IV. CONCLUSION
 
 40
 The evidence did not demonstrate lost profits to White Martin from K-Mart related work to a reasonable degree of certainty. Accordingly, judgment n.o.v. was properly granted.[5]
 
 
 41
 Affirmed.
 
 
 
 *
 The Honorable H. Dale Cook, Senior District Judge, United States District Court for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 John White testified that the firm contacted KCPL through a person named Dick Shaw of a company named Shaw Electric and that a meeting was arranged in which John White met with representatives of KCPL and the site was discussed. [Aplt.Appx. 45-49]
 
 
 [2]
 In this diversity case we decided the question of the allowability of lost profits under Kansas Law. Feaster Trucking Service, Inc. v. Kindsvater, Inc., 460 F.2d 180 (10th Cir.1972)
 
 
 [3]
 The case was removed to federal court from the District Court of Johnson County in Kansas
 
 
 [4]
 The mere fact that a business has not engaged in an activity or has not made a profit from an activity in the past does not preclude recovery of lost profits where those profits can be reasonably ascertained without reference to past activities of the plaintiffs. Vickers v. Wichita State University, 518 P.2d 512 (Kan.1974). In addition, the fact that there are alternative possible explanations for a loss of profits unrelated to the tort does not make the evidence of lost profits speculative or uncertain. Feaster Trucking Service, Inc. v. Kindsvater, Inc., 460 F.2d 180 (10th Cir.1972)
 Taking the evidence in this case as a whole, however, we hold that the record on appeal does not demonstrate lost profits with reasonable certainty; the fact that there were other possible explanations for the drop off in White Martin's K-Mart related work and the lack of convincing proof of consistent past profits from K-Mart related work are factors that have a bearing on that determination.
 
 
 [5]
 We note, if only because the appellant relied so heavily at oral argument on the denial of summary judgment, that the issue of whether damages could be proven with reasonable certainty was not before the District Court at summary judgment. White Martin v. Kansas City Power & Light, 839 F.Supp. 788, 789 n. 1 (D.Kan.1993)