## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

_____

**KENNETH M. BESS and**
**THOMAS R. CUMMINGS, JR.,**

     Plaintiffs-Appellants,

                                 Davidson Chancery No. 95-2864-II

vs.                                     C.A. No. 01A01-9707-CH-00319

**ASSOCIATED BROKERS OF**
**TENNESSEE, INC.,**

     Defendant-Appellee.

_____

## FROM THE DAVIDSON COUNTY CHANCERY COURT
## THE HONORABLE CAROL L. MCCOY, CHANCELLOR

D. Alexander Fardon; Harwell Howard Hyne
Gabbert & Manner, P.C. of Nashville
For Appellants

Richard M. Smith, Kenneth S. Schrupp
Smith & Cashion, PLC of Nashville
For Appellee

*REVERSED AND REMANDED*

Opinion filed:



**FILED**

**July 10, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

**DAVID R. FARMER, JUDGE**

**HOLLY KIRBY LILLARD, JUDGE**

This appeal involves a dispute concerning distribution to stockholders in a closely held corporation. Plaintiff-stockholders, Kenneth M. Bess (Bess) and Thomas R. Cummings, Jr., (Cummings) appeal from the judgment of the trial court denying the relief sought against defendant, Associated Brokers of Tennessee, Inc. (ABT). Plaintiffs' complaint alleges that by virtue of the stockholder agreement dated May 3, 1990, between them and William W. Johnson (Johnson) and ABT, Bess became a 25 percent shareholder of ABT and Cummings became a 20 percent shareholder of ABT. Plaintiffs allege that in late 1994, Johnson caused ABT to sell all or substantially all of its assets to Acosta Sales Company, Inc. (Acosta). The plaintiffs aver that although they were directors and shareholders, they were not informed of the transaction until it had been consummated and were not given an opportunity to vote on the transaction. Plaintiffs further allege that since the sale of the assets to Acosta, ABT has been diverting all of the payments made by Acosta to Johnson, who is not performing any services for ABT. Plaintiffs aver that as shareholders, they were entitled to vote pursuant to T.C.A. § 48-22-102 (1995) concerning the sale of the assets, and further that they were not advised of their rights as dissenters as provided in T.C.A. §§ 48-23-201, *et seq.* (1995).

Plaintiffs' complaint seeks an injunction requiring ABT to comply with the provisions of T.C.A. § 48-23-201 *et seq.*, or, alternatively, for a judgment against ABT in an amount equal to the fair value of their stock at the time of the sale. Plaintiffs also seek attorney's fees and costs.

ABT's answer admits that the plaintiffs became shareholders on May 3, 1990, but avers that they were not shareholders at the time of the sale of the assets to Acosta. It admits that the plaintiffs were directors at the time of the Acosta transaction and that they were not notified and given the opportunity to vote upon the transaction. ABT admits that Johnson has been receiving the payments made by Acosta for the assets, stating specifically: "As the sole shareholder of the Defendant, William W. Johnson received and is currently receiving payments from Acosta Sales Company, Inc. in return for the sale of the assets of the Defendant." The answer denies the remaining material allegations of the complaint and joins issue thereon. Bess and Cummings were employed by ABT in 1976 and 1980 respectively. At the time that Cummings joined ABT in 1980, Johnson served as president of the corporation and owned one hundred (100%) percent of the stock. By 1990, ABT was struggling financially. As a result, Johnson and the plaintiffs

entered into a Stockholder Agreement whereby Johnson agreed to sell 125 shares of ABT to Bess

(25% of the company's stock) in exchange for a $30,000 promissory note, and 100 shares of

ABT to Cummings (20% of the stock) in exchange for a $24,000 promissory note. The

Stockholder Agreement states in pertinent part:

> Payment shall be made by the execution of a promissory note in the original principal amount of the purchase price for each of the purchasers . . . .

The promissory notes signed by the plaintiffs each include a payment schedule and an

acceleration clause whereby the holder (Johnson) may elect for the principal to become

immediately due and payable in the event of default. The notes are collateralized by the

respective shares sold by the agreement, and the notes specifically provide:

> As security for the payment of this Note, the holder shall retain possession of in pledge and have a security interest in the one hundred (100) shares of common stock of Associated Brokers, Inc., being conveyed pursuant to a Stockholder Agreement of even date herewith between William W. Johnson, Kenneth M. Bess, and Thomas R. Cummings, Jr., until such time as this Note has been paid in full. All rights in connection with or incident to the ownership of such shares shall be vested solely in the holder of this Note until such time as this Note has been paid in full.

It is undisputed that at the time of the trial, no payments had been made on the notes by either

Bess or Cummings, and Johnson had not demanded payment or otherwise taken any action

authorized by the notes.

In December of 1993, a representative of Acosta Sales Co., Inc., a large regional broker,

indicated an interest in purchasing ABT's assets. Johnson negotiated a sale on behalf of ABT,

which entered into a Master Broker Agreement and an Agreement for Purchase of Assets with

Acosta on February 28, 1994. In accordance with the Master Broker Agreement, Acosta agreed

to pay ABT over a period of ten years a variable stream of revenue that reflects a portion of the

commissions that Acosta earns from ABT's product lines. Johnson testified that he orally agreed

at this time to retire after one year and sign a non-compete covenant. The Agreement for

Purchase of Assets includes the following clause:

> Covenant Not to Compete.  To facilitate the sale and the purchase of the Assets pursuant to this Agreement, Seller hereby agrees that it shall not within the Central and East Tennessee [illegible] engage in competition with Buyer, either directly or indirectly, in the operation or ownership of a food brokerage or food services businesses [sic].

The Agreement for Purchase of Assets explicitly defines "Seller" as "ABT."[1] The remainder of ABT's employees, including the plaintiffs, were to be indefinitely employed by Acosta. Many of these employees, including the plaintiffs, signed non-compete covenants with Acosta in exchange for the consideration of employment with Acosta.

On May 31, 1994, Johnson, acting on behalf of ABT, entered into a revised Master Broker Agreement with Acosta. This revised agreement alters the revenue stream and also includes a non-compete covenant that did not appear in the original Master Broker Agreement signed on February 28, 1994. This clause states:

> Johnson agrees that during such period of receipt of monthly payments hereunder, he will not directly or indirectly enter into, or in any manner take part in, any business, profession or other endeavor, whether as an employee, agent, independent contractor, owner or otherwise, in the Central and East Tennessee Markets which is in competition with Acosta's food brokerage business.
> . . .

One of Acosta's remedies for breach of this covenant is relief from the obligation to make payments under the terms of the agreement.

Following a bench trial, the trial court found that Bess is a 25 percent shareholder and Cummings is a 20 percent shareholder of ABT. The trial court, however, found that Johnson held a security interest in the plaintiffs' shares, thus entitling Johnson to "all the rights in connection with or incident to the ownership of the shares." Because Johnson was a beneficial shareholder, the trial court held that the plaintiffs did not have the statutory right to exercise dissenters' rights in accordance with T.C.A. §§ 48-23-201 *et seq.*.

The trial court proceeded to find that the value of Johnson's non-compete covenant reflected in the revised Master Broker Agreement equals $90,000 per year for each of the ten years of the revenue stream pursuant to the agreement. The trial court, then, ordered ABT to pay Johnson $7,500 each month for ten years as consideration for his signing the covenant. After each monthly payment has been made to Johnson, the trial court held that each of the shareholders is entitled to any remainder of the proceeds from ABT's sale in accordance with their proportionate ownership. The trial court, however, held that ABT is not required to make

---

[1] We note that the Agreement for Purchase of Assets contains no sale price. Apparently, the sale price for the assets is included in the sums due under the Master Broker Agreement.

certain distributions to the ***plaintiffs*** until the expiration of the ten-year period.[2] In addition, the trial court ruled that ABT is not required to make distributions to the plaintiffs until they have fully paid the amounts due under the promissory notes.

On appeal, the plaintiffs contend that the trial court erred when it ordered ABT to pay Johnson $900,000 for the non-compete covenant. The plaintiffs also argue that the trial court erred when it held that ABT need not make certain distributions to the plaintiffs until the ten-year revenue stream expires and until the promissory notes are paid.[3]

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

It is fundamental corporate law that an owner of a corporation's stock is entitled to a proportionate share of any of the corporation's distributions. *See, e.g.,* 7 Tenn. Jur. *Corporations* § 43 (1997); 11 Fletcher's Cyclopedia of Corporations *Stock & Stockholders* § 5352 (1995). The plaintiffs contend that the trial court's ruling abrogates this principle: by mandating that proceeds from the Acosta revenue stream are initially diverted to compensate Johnson for the non-compete covenant, the plaintiffs are effectively divested of their pro rata share of the revenue. The plaintiffs note that Johnson's non-compete covenant was not executed until the revised Master Broker Agreement was signed in May of 1994, three months after the initial Master Broker Agreement was signed.[4] Since all of the agreements between ABT and Acosta require Acosta to make all payments to ABT, the plaintiffs further argue that the trial court has effectively rewritten these agreements so that $900,000 from this revenue stream is diverted to Johnson. Finally, the plaintiffs assert that the record does not support the trial court's finding that Johnson's non-compete covenant was worth $900,000 to Acosta.

ABT responds by contending that ABT benefitted from Johnson's non-compete covenant, since Acosta would

---

[2] The trial court also held that each of the shareholders bears pro rata responsibility for any shortfall for payments to be made to Johnson pursuant to the $900,000 non-compete covenant.

[3] The plaintiffs do not appeal the trial court's holding that they are not entitled to exercise dissenters' rights, and ABT does not appeal the trial court's finding that the plaintiffs are shareholders.

[4] The plaintiffs point out that the non-compete clause in the Agreement to Purchase Assets states that ABT (in contrast to Johnson) may not compete.

not have entered into the agreements had the covenants not been included.[5] If the plaintiffs' theory prevails, ABT insists that Johnson will receive no consideration for and benefit from the non-compete covenant. In contrast, ABT has not received a benefit from the non-compete covenants by the plaintiffs, who are able to continue to be employed by Acosta. In addition, ABT contends that it will be "unjustly enriched" if it is permitted to retain the benefit from Johnson's non-compete covenant without compensating Johnson.

In *Warren v. Metropolitan Gov't of Nashville & Davidson County*, 955 S.W.2d 618 (Tenn. App. 1997), we discussed the role of a Court in interpreting a contract:

> Courts are to interpret and enforce the contract as written, according to its plain terms. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355, 358 (1955); *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 177 S.W.2d 545, 546 (1944). We are precluded from making new contracts for the parties by adding or deleting provisions. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn.1984); *Shell Oil Co. v. Prescott*, 398 F.2d 592 (6th Cir.1968). When clear contract language reveals the intent of the parties, there is no need to apply rules of construction. An ambiguity does not arise in a contract merely because the parties may differ as to interpretation of certain of its provisions. *Oman Construction Co. v. Tennessee Valley Auth.*, 486 F.Supp. 375 (M.D.Tenn.1979). A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one; a strained construction may not be placed on the language used to find an ambiguity where none exists. *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn.1973). We are to consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn.App.1994). If a contract is plain and unambiguous, the meaning thereof is a question of law for the court. *Petty v. Sloan*, 277 S.W.2d at 358.

*Id.* at 622-23. According to the plain terms of the contracts between ABT and Acosta, which *Johnson* negotiated for on behalf of ABT, the revenue stream paid by Acosta is paid solely to ABT. Nothing in the contracts indicates that any of the proceeds should be paid directly to Johnson, nor is there evidence of any agreement between ABT and Johnson by which ABT agrees to compensate Johnson for acceding to the non-compete covenant.

Not only is there is no evidence of any agreement between ABT and Johnson concerning compensation to

---

[5] ABT disputes the plaintiffs' argument that the original agreements signed in February of 1994 did not include Johnson's non-compete covenant. ABT contends that the intent of the covenant in the Agreement for Purchase of Assets was to apply to Johnson and not to ABT. ABT also asserts that ABT and Acosta orally agreed throughout the course of the negotiations that Johnson would be barred from competing with Acosta and that he would retire after one year. ABT notes that the trial court found that the initial Master Broker Agreement that did not contain the covenant was drafted "in a hurried fashion . . . because payroll had to be made on March the 1st."

Johnson for the non-compete covenant, Johnson's answer to the complaint specifically states that he is receiving the Acosta payments as the sole shareholder of ABT and in return for the sale of the assets. Moreover, we find nothing in the record to suggest a value for Johnson's non-compete covenant.

Tennessee Code Annotated § 48-16-401 (1995) addresses the authorization for shareholder distribution by a board of directors. In the absence of any enforceable contracts to the contrary, all distributions from a corporation to shareholders must be disbursed pro rata. *Tubb v. Fowler*, 118 Tenn. 325, 99 S.W. 988 (1906); 7 Tenn. Jur. *Corporations* § 43; 11 <u>Fletcher's Cyclopedia of Corporations</u> *Stocks & Stockholders* § 5352. ABT has not cited any authority that would warrant an exception to this principle. Since there is no evidence of any provision for payment by ABT to Johnson for his non-compete covenant with Acosta, any amounts received by Johnson should be considered a distribution from ABT. *See* T.C.A. § 48-11-201 (8) (1995).

It is undisputed that neither plaintiff has paid any amount due under the promissory notes held by Johnson for the purchase price of the stock. The notes provide that the shares of stock are held as security for the payment of the notes and while the notes remain unpaid, Johnson, as the holder thereof, retains all rights of ownership in the shares, which necessarily must include the right to receive a

shareholder distribution. 11 <u>Fletcher's Cyclopedia of Corporations</u> *Stocks & Stockholders* § 5382 (1995). However, since the stock is held as a security for an indebtedness, any amounts received by the beneficial owner only apply to reduce the amount of the indebtedness. *Payne v. Fowler*, 12 Tenn. App. 449, 461 (1930) ("The rule is that in the absence of an agreement to the contrary, a pledger of shares of stock as collateral security carries with it, as an incident of the pledgee's special ownership, the right to receive dividends after declared, *to be applied on the debt*," (citing 6 Fletcher's Cyclopedia of Corporations, § 3704))[6] (emphasis added); *see also Nashville Trust Co. v. First Nat. Bank*, 123 Tenn. 617, 626, 134 S.W. 311, 314 (1911) ("The pledgee does not acquire absolute title by such a contract, but only a special property in the thing pledged, with the right to possession *until the object of the pledge be accomplished*.") (emphasis added); Annotation, *Right of Pledgee of Corporate Stock in Respect of Dividends Declared Thereon*, 67 A.L.R. 485 (1930), 103 A.L.R. 849 (1936); Kenneth B. Davis, Jr., *Pledged Stock and the Mystique of Record Ownership*, 1992 Wis. L. Rev. 997, 1001-02 (1992). This is reinforced by Tennessee's adoption of Article 9 of the Uniform Commercial Code, which states that, in the absence of an agreement to the contrary, when the pledgee possesses the collateral:

> (c) the secured party may hold as additional security any increase or profits

---

[6] This principle is found in the revised Fletcher's treatise at 12A <u>Fletcher's Cyclopedia of Corporations</u> *Stock & Stockholders* § 5656 (1993).

> (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation.

T.C.A. § 47-9-207 (2)(c) (1996).

The judgment of the trial court ordering ABT to pay the sums as set out therein is vacated. Payments made to Johnson heretofore are considered a distribution that should be allocated between Bess, Cummings, and Johnson, in accordance with their stock ownership. The amounts due Bess and Cummings shall first be paid on the note indebtedness, and the case must be remanded to the trial court for determination as to the correct amount of the indebtedness due on the notes and the amount paid to Johnson thus far as a distribution. When the entire indebtedness on the notes is paid, the ownership of the shares reverts to Bess and Cummings, and they are then entitled to receive their pro rata distribution.

In sum, the judgment of the trial court is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. Costs of the appeal are assessed one-half to plaintiffs and one-half to defendant.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**DAVID R. FARMER, JUDGE**

_____
**HOLLY KIRBY LILLARD, JUDGE**

8