IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 16, 2004 Session

## LANI THOMAS ARNOLD and AMES DAVIS, Administrator of the Estate of Mary Reeves Davis v. W. TERRY DAVIS

**A Direct Appeal from the Probate Court for Davidson County**
**No. 00P537      The Honorable Frank G. Clement, Jr., Judge**

**No. M2003-00620-COA-R3-CV - Filed June 17, 2004**

This case involves the interpretation of certain provisions of a Trust Instrument.  The trial court found a latent ambiguity in the Instrument, allowed extrinsic evidence, and granted Appellee's Motion for Summary Judgment.  Appellant appeals.  We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Gregory H. Oakley and Daniel W. Small of Nashville for Appellant, W. Terry Davis

Ames Davis and Sally B. Buntin of Nashville for Appellees, Lani Thomas Arnold and Ames Davis, Administrator of the Estate of Mary Reeves Davis

R. Horton Frank III of Nashville for Appellee, Lani Thomas Arnold

### OPINION

This case involves the interpretation of certain provisions of a trust instrument.  The trial court found a latent ambiguity in the instrument, allowed extrinsic evidence, and granted Appellee's Motion for Summary Judgment.  Appellant appeals.  We affirm but with the added provision that the paragraph of the trust instrument, under which Appellant claims, is a testamentary disposition, which fails to comport with the requirements of T.C.A. § 32-1-104 (2001).

Mary Reeves Davis ("Mrs. Davis," or "Decedent") is the widow of the late country music star, Jim Reeves.  W. Terry Davis ("Mr. Davis," or "Appellant") is Mrs. Davis's second husband and, at the time of her death, they had been married for some twenty-five years.

On June 24, 1996, Mr. Davis, as holder of a Durable Power of Attorney executed by Mrs. Davis on May 25, 1996, negotiated an agreement under which Mrs. Davis sold all of her real property for $3.8 million to United Shows of America ("United Shows") and sold all of her property

related to Jim Reeves Enterprises (which she owned as sole legatee of her late husband, Jim Reeves) for $3.5 million to United Shows. Concerning where the monies from the United Shows sale would go, Mr. Davis entered into an agreement (the "Agreement") with W.D. White, the brother of Mrs. Davis.[1] This Agreement, dated June 28, 1996, provides, in relevant part, as follows:

> 1. Terry Davis agrees to establish an Irrevocable Trust to provide for the immediate and life-long personal and health-care needs of Mary Reeves Davis.
>
> *                                   *                                   *
>
> 4. The primary purpose of the Trust shall be to provide for the immediate, and life-long personal needs of Mary Reeves Davis, at a standard commensurate with the life-style she has been accustomed to enjoying; and to provide for her health-care as medically indicated.
>
> 5. A secondary purpose of the Trust shall be to perpetuate the memory of the late Jim Reeves, by providing for the maintenance of the Jim Reeves burial site and monument near Carthage, Panola County, Texas.
>
> *                                   *                                   *
>
> 7. The monies for establishing the Trust shall be fifty percent (50%) of the funds paid by United Shows of America...for the properties held by Mary Reeves Davis and/or Mary Reeves Davis and Terry Davis, in the amount of approximately 7.3 million dollars ($7,300,000.00). These funds shall be paid directly to the Trust by the purchasers of these properties.
>
> 8. In the event that Terry Davis is living at the time of Mary Reeves Davis' death, the Trust shall be closed and the assets transferred to Mary Reeves Davis' husband.

On July 11, 1996, Mrs. Davis signed a document titled "Trust Indenture Mary Reeves Davis Inter-Vivos Trust" (the "Trust").[2] The Trust was prepared by Carrol D. Kilgore, the attorney who represented Mrs. Davis and provides, in pertinent part, as follows:

III.

---

[1] Mrs. Davis is not a party to this Agreement. Mr. Davis signed the Agreement individually and not on behalf of Mrs. Davis.

[2] Prior to the July 11, 1996 Trust, Mrs. Davis executed another trust on April 25, 1996. This "first trust" was revoked on May 25, 1996.

     *                           *                     *

(2) After escrowing funds for taxes as aforesaid, the Trustee shall segregate and hold in trust under this instrument my half of the proceeds of each such payment as contemplated by *The Agreement*,[3] and then pay to my husband, **W. TERRY DAVIS**, his half if it [sic].[4]

     *                           *                     *

## IV.

This Trust shall terminate upon my death and it shall thereupon be the duty of the Trustee, subject to the payment of any fiduciary income taxes that may be an obligation of the Trust, to pay all trust corpus and accrued income to the administrator or executor of my estate subject to the provisions hereinafter contained that shall be applicable in the event that I shall survive my husband, **W. TERRY DAVIS**. The disposition of the assets in my estate shall be as determined by the Probate Court in accordance with any valid wills and codicils I may heretofore or hereafter have executed, debt obligation instruments and any other valid legal instruments heretofore or hereafter executed by me.

## V.

In the event I shall predecease my husband, **W. TERRY DAVIS**, the Trustee, subject to such fiduciary tax liabilities as may be imposed upon it may make distribution to **W. TERRY DAVIS** in

---

[3] *The Agreement* refers to that entered between Mr. Davis and Mr. White, *see supra*.

[4] In the preceding drafts of the Trust Instrument, Article III ¶2 read as follows:

(2) After escrowing funds for taxes as aforesaid, the Trustee shall segregate and hold in trust under this instrument my half of the proceeds of each such payment as contemplated by *The Agreement*. The Trustee shall then pay to my husband, **W. TERRY DAVIS**, his half if it determines that *The Agreement* together with my power of attorney granted him on May 25, 1996, vests him with legal entitlement to such share. If it determines that such does not vest him with such ownership then I now
AFFIRM/DO NOT AFFIRM _____
[Delete One]                 MARY REEVES DAVIS
such gift. If I affirm such gift, my Trustee shall honor it upon receipt of a written certification by my physician, **RICHARD MARGOLIN, M.D.**, of his conclusion , on the basis of appropriate testing, that I have the present mental competence to make such gift in view of (a) my long and happy marriage to the donee and (b) the amount of the gift.

-3-

accordance with the provisions of paragraph 8 of *The Agreement,* subject to the overriding instructions of Article III, ¶2 hereof.[5] If payment directly to my husband be not authorized thereby, such moneys shall be paid into my estate in accordance with Article IV hereof.[6]

On August 28, 1996, Lani Thomas Arnold ("Arnold," or "Appellee"), a niece of Jim Reeves, filed a "Petition for Appointment of Conservator and Order to Show Cause," in which Arnold alleged that Mrs. Davis was incompetent and sought to enjoin the sale of all of Mrs. Davis's assets to United Shows under the agreement negotiated by Mr. Davis between Mrs. Davis and United Shows.

On December 20, 1996, the trial court appointed a guardian ad litem for Mrs. Davis. On January 14, 1997, the guardian ad litem filed a "Preliminary Report," in which he recommended that a conservator be appointed for Mrs. Davis based upon her present mental and physical impairments.

On January 17, 1997, Arnold filed her "First Amended Petition for Appointment of Conservator and Order to Show Cause" (the "Amended Petition"), naming Mr. Davis, Mrs. Davis and United Shows as Respondents.[7] The Amended Petition alleged that Mrs. Davis was incompetent to establish the Trust, and again alleged that the sale of her assets to United Shows was not in her best interest.[8] By Order of January 23, 1997, Mrs. Davis's brother, W.D. White, was appointed temporary conservator. On June 28, 1997, W.D. White died. Upon his "Motion to Intervene and to be Appointed Conservator," the trial court, on August 25, 1997, appointed Mrs. Davis's nephew, the Reverend Dr. William H. White of Dallas, Texas, to act as Conservator "of the person and the estate of Mary Reeves Davis." The court instructed Mr. White to investigate the power of attorney granted Mr. Davis, the sale of Mrs. Davis's assets to United Shows, and the July 11, 1996 Trust executed by Mrs. Davis.

Based, *inter alia*, upon the report of the Conservator, the trial court entered an Order on November 5, 1997, which approved the sale of Mrs. Davis's assets to United Shows but reserved any ruling on the validity of the Trust (except to direct the trustee under the Trust to receive payments made by United Shows for the assets and to pay Mr. Davis $20,000 per month out of the trust assets pending further proceedings).

---

[5] Although the "overriding language," as set out *supra* at note 4 was deleted from the final draft of the trust instrument, this reference to that "overriding language" was left in here at Article V.

[6] By amendment dated July 25, 1996, Mrs. Davis's CPA, Charles Young, was substituted for Mr. Davis as trustee of the Trust.

[7] United Shows was dismissed from this suit by Order of January 15, 1998.

[8] Arnold was allowed to file a "Second Amended and Supplemental Petition for Appointment of Conservator and to Set Aside Transfer of Property" on October 5, 2001. This second amended petition reflected events that had taken place since the first Amended Petition was filed.

Mrs. Davis died on November 11, 1999. On January 14, 2000, the trial court entered its "Order Permitting Interpleader of Trust Funds," which directed the trustee of the Trust to pay into the court all funds held under the Trust, and directed United Shows to make all further payments in connection with the purchase of Mrs. Davis's assets to the court, and directed that the claimants to the trust property must prosecute any claims relative to the Trust, including any claims as to the validity of the Trust, in the proceeding initiated by Arnold.

On August 8, 2000, Ames Davis ("Administrator"), as the Court-Appointed Administrator for the Estate of Mary Reeves Davis (the "Estate"), filed an Intervening Petition, asking the probate court to rule that the validity of the Trust is moot because, under the terms of the Trust, the corpus of the Trust passed to the Estate upon Mrs. Davis's death.

On August 16, 2001, Ames Davis filed "Administrator's Motion for Summary Judgment" (the "Motion for Summary Judgment"). The Motion for Summary Judgment cited Article IV of the Trust (*see supra*) for the proposition that, since Mrs. Davis did not survive her husband, "any provisions which might govern had she survived W. Terry Davis have been pretermitted and rendered moot, and under Article IV, the Administrator is vested with the sole title to the trust assets." Ames Davis also filed a "Rule 56.03 Statement of Undisputed Fact in Support of *Administrator's Motion for Summary Judgment*":

> Pursuant to Rule 56.03 of the Tennessee Rules of Civil Procedure, Ames Davis, Administrator C.T.A. of the Estate of Mary Reeves Davis (the "Administrator") specifies the following statement of material facts as to which the Administrator contends, solely for purposes of his Motion for Summary Judgment, that there is no genuine issue of disputed fact. The Administrator reserves the right, in the event the Motion for Summary Judgment is denied, to object at trial to admission of extrinsic evidence relative to the intention of Mary Reeves Davis, as clearly expressed in Article IV of the Trust Instrument which she executed dated July 11, 1996, on the grounds that such evidence violates the parole evidence rule. The Administrator is entitled to summary judgment regardless of whether such extrinsic evidence is admitted. Such facts established by such extrinsic evidence are cited for the sole purpose of demonstrating that even if such evidence were admissible, the facts which they would indisputably establish entitle the Administrator to summary judgment as a matter of law.
>
> 1. On or about June 23, 1996, W. Terry Davis, as holder of a Durable Power of Attorney executed by Mary Reeves Davis, negotiated agreements under which Mary Reeves Davis sold (the "Sale") all of her real property for $3.8 million to United Shows of America and sold all of her property related to Jim Reeves Enterprises (which she owned as sole legatee of her late husband, Jim Reeves) for $3.5 million to United Shows and an agreement of

-5-

United Shows to pay 5% of Jim Reeves RCA royalties jointly to Mary Reeves Davis and her husband, W. Terry Davis.  Article II of the Trust Indenture dated July 11, 1996 (the "Trust Indenture"), a copy of which is Exhibit 1 to the Deposition of Carrol D. Kilgore taken May 16-17, 2001.

2.  Under Article II of a Trust Indenture executed by Mary Reeves Davis, dated July 11, 1996, Mary Reeves Davis purportedly assigned all her contractual rights to receive payments from United Shows under the Sale to her trustee under the Trust Indenture. Trust Indenture, Article II.

3.  After a Conservator for Mary Reeves Davis was appointed, the Sale was approved by Order of this Court entered November 4, 1997.  Order dated November 4, 1997, in Conservatorship proceedings.

4.  The obligations of United Shows' representing the proceeds of the Sale, if properly a part of the Trust corpus, are in the form of United Shows' promissory Notes in the original principal amount of $7.3 million, which call for periodic payments from United Shows; and Mary Reeves Davis' contractual right to receive half of the 5% royalties pertaining to songs of the late Jim Reeves.  Trust Indenture, Article II; Order of this Court entered November 4, 1997, in Conservatorship Proceedings.

5.  Paragraph IV of the Trust Indenture dated July 11, 1996, provides as follows:

> This trust shall terminate upon my death and it shall thereupon be the duty of the Trustee, subject to the payment of any fiduciary income taxes that may be an obligation of the Trust, to pay all trust corpus and accrued income to the administrator or executor of my estate subject to the provisions hereinafter contained that shall be applicable in the event that I shall survive my husband, W. TERRY DAVIS.  The disposition of the assets in my estate shall be as determined by the Probate Court in accordance with any valid wills and codicils I may heretofore or hereafter have executed, debt obligation instruments and any other valid legal instruments heretofore or hereafter executed by me.

Trust Indenture, Article IV.

6. Mary Reeves Davis did not survive her husband, W. Terry Davis.

Pleadings.

7. At page 40 of his deposition, Carrol D. Kilgore, who represented Mary Reeves Davis in the preparation and execution of the Trust Instrument dated July 11, 1996, testified as follows:

> Q. Mr. Kilgore, you have identified as Exhibit 1 this trust instrument dated July 11, 1996.
> A. That's right.
> Q. Paragraph Roman numeral IV on Page 4 of this agreement specifies that the trust shall terminate upon the death of Mary Reeves Davis. And it says that it is the duty of the trustee to pay all trust corpus and accrued income to the administrator or executor of my estate subject to the provisions hereinafter contained that shall be applicable in the event that I shall survive my husband, W. Terry Davis, period, close quote.
> Do you see that?
> A. Yes.
> Q. Did she understand that at her death if her husband survived her that the corpus of this trust would be paid to her estate under this paragraph?
> A. Oh, I think so. I mean, that's the way we discussed it previously, that she had a will which was to control upon her death.

Deposition of Carrol Kilgore, page 40.

8. Article V of the Trust Indenture dated July 11, 1996, provides as follows:

> In the event I shall predecease my husband, W. TERRY DAVIS, the Trustee, subject to such fiduciary tax liabilities as may be imposed upon it may make distribution to W. Terry Davis in accordance with the provisions of paragraph 8 of *The Agreement*, subject to the overriding instructions of Article III, ¶ 2 hereof. If payment directly to my husband be no authorized thereby, such moneys shall be paid into my estate in accordance with Article IV hereof.

Trust Indenture, Article V. (The italics are supplied in the Trust itself.)

9. *The Agreement* is defined in Article I of the Trust Instrument as a contract between W. Terry Davis and W. D. White, a copy of which is attached as Exhibit D to the Trust Instrument. Trust Indenture, Article I and Exhibit D to the Trust Indenture.

10. Mary Reeves Davis was not a party to *The Agreement*. Exhibit D to the Trust Indenture.

11. Paragraph 2 of *The Agreement* provides as follows:

> Terry Davis agrees to establish an irrevocable Trust to provide for the immediate and life-long personal and health-care needs of Mary Reeves Davis.

Exhibit D to the Trust Indenture.

12. Paragraph 8 of *The Agreement* provides as follows:

> In the event that Terry Davis is living at the time of Mary Reeves Davis' death, the Trust shall be closed and the assets transferred to Mary Reeves Davis' husband.

Exhibit D to the Trust Indenture.

13. Upon the death of Mary Reeves Davis, the Trustee did not make any distribution to W. Terry Davis. Pleadings.

14. Prior to preparing the Trust Instrument, Mr. Kilgore received a faxed copy of *The Agreement,* Paragraph 7 of which provided as follows:

> The monies for establishing the Trust [by W. Terry Davis] shall be fifty percent (50%) of the funds paid by United Shows of America . . . for the properties held by Mary Reeves Davis and/or Mary Reeves Davis and Terry Davis, in the amount of approximately 7.3 million dollars ($7,300,000.00). These funds shall be paid directly to the Trust by the purchaser of these properties.

Kilgore deposition, page 69, line 17 through page 70, line 2; Exhibit 22; and Exhibit D to Trust Indenture.

15. *The Agreement* was not executed by Mary Reeves Davis. Exhibit D to Trust Indenture.

16. Mr. Kilgore was not advised that either W. Terry Davis or Dr. White (who later became her Conservator) had power to act on her behalf in connection with *The Agreement*. Kilgore deposition, page 69, line 17 through page 71, line 21.

17. On July 8, 1996, after he had received a copy of *The Agreement*, Mr. Kilgore went to visit Mary Reeves Davis, who was confined in a locked ward at Stones River Nursing Home, in order to explain *The Agreement* to her and seek her instructions. Kilgore deposition, page 71 line 22 through page 73, line 8; page 111, lines 5 through 11.

18. While Mary Reeves Davis did not appear to Mr. Kilgore to be surprised by the provisions of *The Agreement*, Mr. Kilgore did not know who (if anyone) had previously explained it to her. Kilgore deposition, page 74, lines 1 through 15.

19. Mr. Kilgore was concerned that if W. Terry Davis got half of the payments directly from United Shows, he might spend his half without paying the income taxes due thereon. Kilgore deposition, page 76 lines 1 through 6.

20. Mr. Kilgore testified as follows about his conversation with Mary Reeves Davis at the nursing home on July 8, 1996, concerning the purported gift of half the payments received from United Shows to W. Terry Davis:

> I remember I told her that I could not safely protect her half except by paying all the money into trust to secure tax payment because if Terry – something happened to Terry, she could be stuck with the whole tax bill and would not have sufficient assets to pay it. So instead of putting half of it into trust, all of it had to be paid in initially until the tax money was secured . . . and she agreed to that.

Kilgore deposition, page 75, lines 13 through 24.

21. While *The Agreement* seemed to suggest that Mary Reeves Davis had made a gift to W. Terry Davis, Mr. Kilgore was never sure whether any such gift had been made. Exhibit 6 to Trust Indenture, paragraph 7; Kilgore deposition, page 185, lines 10 through 13.

22. Mr. Kilgore testified as follows at his deposition:

> Q. What are the uncertainties with which you were uncomfortable on July 10 [the day before the Trust Instrument was executed], Mr. Kilgore?
> A. Well, the uncertainties was [sic] that this was a monstrous gift from her to her husband. It was entirely contrary to her prior actions. And I had no assurance of her competence and I felt obligated to try to find out if she was competent. And if she wasn't, if there was any doubt about it, to safeguard against it.

Kilgore deposition, page 118, line 14 through page 120, line 23.

23. On July 10, Mr. Kilgore inquired of Mary Reeves Davis' psychiatrist, Dr. Margolin, whether he could give an opinion as to Mary Reeves Davis' competence and was advised that Dr. Margolin would not give an opinion as to her competence. Kilgore deposition, page 118, line 14 through page 120, line 23; Exhibit 26.

24. Mr. Kilgore inserted the following provision (the "Deleted Provision") in Article III of the Trust Instrument as it was originally prepared:

(2) After escrowing funds for taxes as aforesaid, the Trustee shall segregate and hold in trust under this instrument my half of the proceeds of each such payment as contemplated by *The Agreement*. The Trustee shall then pay to my husband, **W. Terry Davis**, his half if it determines that *The Agreement* together with my power of attorney granted to him on May 25, 1996, vests him with legal entitlement to such share. If it determines that such does not vest him with such ownership then I now

AFFIRM/DO NOT AFFIRM   _____
     [Delete One]          MARY REEVES DAVIS

such gift. If I affirm such gift, my Trustee shall honor it upon receipt of written certification by my physician, RICHARD

MARGOLIN, M.D., of his conclusion, on the basis of appropriate testing, that I have the present mental competence to make such gift in view of (a) my long and happy marriage and (b) the amount of the gift.

Kilgore deposition, page 128, line 1 through page 129, line 18.

25.  Mr. Kilgore explained the Deleted Provision as follows:

... It made the trustee make the determination of whether the so-called, quote, the agreement, vested any ownership in Terry. And then if it didn't, then it had the place for Mary to reaffirm the gift if she wanted to.

Q.  Was part of that driven by the fact that Mary was not even a party to the agreement between Terry and W. D. White?
A.  It was mainly driven by the fact that it was obviously void on its face as a gift because Terry was acting under a power of attorney and could not use it to make a gift to himself and I so stated in the conference there.  I said, "Any trustee who sees this will conclude that there is no valid gift to you."
Q.  What was said next in response to those comments?
A.  Well, Terry expressed concern about getting Dr. Margolin in on it.
Q.  Why was he concerned about getting Dr. Margolin?
A.  I don't now why he was concerned.  He just didn't – he just objected to that and Mr. Branstetter expressed agreement with him about the difficulty of getting a psychiatrist's opinion.
Q.  Did Mary express an opinion one way or the other?
A.  She didn't express.  She just sort of indicated agreement after Terry kept insisting and I sort of looked over at her and I said, "Well, I'll take it out if it's okay."  Something like that.  And she gave a very slight nod is the most I can say.  She pretty much didn't show much life during the whole proceedings except that she became alert on the durable power of attorney and I don't recall her saying anything except to chatter with the witnesses who came in, you know.

*     *     *

Q.  Did you change the instrument?
A.  Yes, I took out everything from beginning with the phrase "the trustee shall then pay to my husband" and all the rest of that paragraph I lined out, according to the best of my recollection.

-11-

And then it was retyped. I mean reprinted, of course, from the computer. Just part was deleted.

Kilgore deposition, page 129, line 14 through page 130, line 4; page 132, lines 3-9.

26. At his deposition, Mr. Kilgore testified as follows:

Q.   ... I'm showing you Exhibit 1 now, which is the trust indenture bearing the date which was actually executed. As you understood it, was the purpose of this instrument to accomplish any gift from Mary Reeves Davis to Terry Davis?
A. No. Well, it was initially, as I initially drafted it, it was to give her the opportunity if she wished –
Q. Right.
A. –to make or to decline to make such a gift.
Q. Well, in point of fact, let's look –
A. Now, as it's amended, it was not for the purpose of vesting any rights in him whatever.

Kilgore deposition, page 183, lines 1 - 14.

27. At his deposition, Mr. Kilgore testified as follows:

Q. Now Paragraph V [of the Trust Instrument] talks about money that should be distributed to W. Terry – may be distributed to W. Terry Davis. Is that – what money is that?
A. Well, that was originally written to sort of – with reference to the language which called for a psychiatrist's opinion.
Q. So, in other words –
A. Said shall be subject to the overriding instructions of Article III, Paragraph (2). And when this was written, Article III, Paragraph (2), had the provision in it calling for the trustee to pass judgment on whether Davis, Terry Davis had already achieved ownership; and if not, then this alternative of Mary now approving a gift to Terry.
Q. Okay.
A. And now it just says – it doesn't make a lot of sense as it's left now but I didn't go back and revisit this.
Q. Well, but –
A. But the overriding instructions of Article III, Paragraph (2), are to escrow funds first for taxes. But it does speak, instead of the entire corpus, it speaks of individual payments. That is, it was anticipated that United Shows would make individual payments pursuant to these various contracts and this was to be immediately

-12-

split after the trustee determined how much money should be set aside for taxes.

Q. And was it your understanding that at Mary Reeves Davis' death that arrangement was to terminate and it was all to be paid over to her executor?

A. Well, I think I understood that upon her death if the trustee had any money in hand from an undistributed payment that Terry – the half that wasn't Mary's could be paid over to Terry but then everything would be transferred to her executor.

Q. Now –

A. Of course, I really didn't know in this whether – you know, I assumed this was adequate to assign the note and the contracts –

Q. To the trust?

A. – to the trustee, assuming there was no prior assignment to Terry.

Q. Now, was it the purpose of this trust indenture as you understood it to implement the entire agreement [*The Agreement*] which is Exhibit D to the agreement?

A. Absolutely not.

Q. So does this language here mean in Paragraph 1 [of *The Agreement*] where it says Purpose? Does it – did you mean – why doesn't that mean to implement the entire agreement?

A. Because it says to implement as herein provided the agreement made between Davis and White. And so if it's herein provided to implement that agreement, it's to be implemented. If it's not so provided herein, then the agreement has no effect.

Kilgore deposition, page 189, line 4 through page 191, line 9.

On July 8, 2002, Mr. Davis filed a "Response to Administrator's Statement of Undisputed Facts and W. Terry Davis' Statement of Facts in Opposition to Administrator's Motion for Summary Judgment" (the "Response"). The Response admits all of the Administrator's facts for purposes of summary judgment, except (1) Mr. Davis disputes the admissibility of the deposition testimony of Carrol Kilgore, Mrs. Davis's attorney who prepared the Trust; (2) Mr. Davis denies that Mrs. Davis was not a party to a document exhibited to the Trust and referred to therein as "*The Agreement*." Mr. Davis argued that Mrs. Davis became a party to the Agreement because she signed the Trust to which the Agreement was exhibited. In addition to his Response, Mr. Davis submitted his own Affidavit in opposition to the Administrator's Motion for Summary Judgment.

Following a hearing, the trial court entered its "Memorandum Opinion" on January 22, 2003, which granted the Administrator's Motion for Summary Judgment. Mr. Davis appeals from the Order granting Ames Davis's Motion for Summary Judgment and raises one issue for

review as stated in his brief: Whether the trial court improperly interpreted the Decedent's Trust Instrument and thus erred by granting the Administrator's Motion for Summary Judgment.

Resolution of the issue in this case was determined as solely dependent upon the construction of the provisions of the Trust and we will first review the case on that premise. The language used in a written instrument must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn.1975). In construing written instruments, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North American Life & Cas. Co.*, 667 S.W.2d 79 (Tenn.Ct.App.1983). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526 (Tenn.Ct.App.1981). A written instrument is not ambiguous merely because the parties have different interpretations of the instrument's various provisions, *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc*., 884 S.W.2d at 462 (citing *Oman Constr. Co. v. Tennessee Valley Auth.*, 486 F.Supp. 375, 382 (M.D.Tenn.1979)), nor can this Court create an ambiguity where none exists in the instrument. *Cookeville P.C.*, 884 S.W.2d at 462 (citing *Edwards v. Travelers Indem. Co.*, 201 Tenn. 435, 300 S.W.2d 615, 617-18 (1957)). The court should first seek the parties' intention by examining the words in the written instrument, *Hutchison v. Board*, 250 S.W.2d 82, 84 (Tenn. 1952), and by considering these words in the context of the instrument as a whole. *Collins v. Smithson*, 585 S.W.2d 598, 603 (Tenn. 1979); *Barber v. Westmoreland*, 601 S.W.2d 712, 714 (Tenn. Ct. App. 1980). Courts customarily decline to consider parol evidence that adds to, varies, or otherwise contradicts the language of the instrument. *Stickley v. Carmichael*, 850 S.W.2d 127, 132 (Tenn. 1992). However, parole evidence may be admissible to remove a latent ambiguity. *Stickley v. Carmichael*, 850 S.W.2d at 132; *Estate of Burchfiel v. First United Methodist Church*, 933 S.W.2d 481, 482 (Tenn. Ct. App. 1996). A latent ambiguity is found where:

> ...the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of.

*Teague v. Sower*, 114 S.W. 484, 488 (Tenn. 1908) (citing *Weatherhead v. Sewell*, 28 Tenn. (9 Humph.) at 295.

On the other hand, parole evidence is not admissible to explain a patent ambiguity contained within the instrument. *Estate of Burchfiel v. First United Methodist Church*, 933 S.W.2d at 482. A patent ambiguity is defined as:

> one produced by the uncertainty, contradictoriness, or deficiency of the language of an instrument, so that no discovery of facts, or proof

of declarations, can restore the doubtful or smothered sense without adding ideas which the actual words will not themselves sustain.

*Teague v. Sower*, 114 S.W. 484 at 488 (citing *Weatherhead v. Sewell*, 28 Tenn. (9 Humph.) at 295.

In other words, a patent ambiguity is one which appears on the face of the instrument; while a latent ambiguity is one "...where the instrument is unambiguous on its face, but becomes open to more than one interpretation when applied to the factual circumstances." 76 Am. Jur. 2d Trusts § 694 (2003).

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ.P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. The question of whether a trust document is ambiguous is a question of law." 76 Am. Jur. 2d Trusts § 686 (2003). The interpretation of a written instrument is also a matter of law and not of fact. *See Rainey v. Stansell*, 836 S.W.2d 117 (Tenn.Ct.App.1992). Summary judgment is a preferred vehicle for disposing of purely legal issues. *See Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993); *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31 (Tenn.1988). Since the question of ambiguity and the construction of a written instrument both involve legal issues, these matter are particularly suited to disposition by summary judgment. *See, e.g., Browder v. Logistics Management, Inc*., 1996 WL 181435, 1996 LEXIS Tenn.App. 227 (Tenn.Ct.App.1996); *see also Rainey*, at 119. Since only questions of law are involved here, there is no presumption of correctness regarding the trial court's grant of summary judgment. *Bain* at 622. Therefore, our review of the trial court's grant of summary judgment is de novo on the record before this Court. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn.1997).

We have reviewed the Trust in its entirety and we find that the trial court was correct in finding a latent ambiguity as to whether Mrs. Davis intended that Mr. Davis receive the assets outright if he survived Mrs. Davis, or whether he was to receive them in a fiduciary capacity for Mrs. Davis's Estate, or whether the assets passed to the Estate at all.[9] Because we

---

[9] The trial court gives a thorough analysis of this ambiguity in its January 22, 2003 Memorandum Opinion, to wit:

> ...Article I of the Trust states that Mary Reeves Davis' purpose in creating the Trust is to provide for her living expenses and medical care and treatment during her life and to provide for the disposition of her property that is to be held in trust upon its termination. Article I also provides that a purpose of the trust is to "implement, as herein provided, the Agreement." Additionally, Article III provides that the trustee should perpetuate the memory of Jim Reeves pursuant to Paragraph 5 of the

(continued...)

Agreement which provides that Jim Reeves' grave site should be maintained and Article III (1) provides that another purpose of the trust is to provide for the proper payment of taxes on the monies received from United Shows. The Agreement further provides that the "primary purpose" of the Trust is to provide for Mary Reeves Davis' personal needs and health care.

While there are numerous stated purposes in the Agreement, the only purpose stated both in the title and again in the body of the Agreement and additionally stated to be the primary purpose is to provide for the personal needs and health care of Mrs. Davis. Moreover, it is the logical purpose in that her health was failing at the time the Trust and Agreement were created. Further, the Agreement was an agreement between her brother and her husband (she was not a party to the Agreement), each of whom were purportedly acting to protect her and care for her as her health declined. Moreover, while her brother and husband may have been authorized by the respective powers of attorney to act for her and in her best interest to see that she was provided for during her life, neither had apparent authority to act beyond that point. Particularly, neither had authority to dispose of her estate as they might choose.

Article IV of the Trust provides that the trust shall terminate upon the death of Mary Reeves Davis. Upon the termination of the trust, the Trustee is directed to pay the trust's income and corpus to the administrator or executor subject to two conditions: first, the income tax obligations of the trust must be paid and, second, payment of the trust corpus and accrued income is "subject to the provisions hereinafter contained....." Some of the "provisions hereinafter contained" are found in Article V.

Article V provides that if Mary Reeves Davis predeceases her husband (which she did) the Trustee *may* make distribution to Terry Davis, subject to, tax liabilities being satisfied, in accordance with paragraph 8 of the Agreement. However, Article V further states that this permissive authority of the Trustee (who *may* distribute) is further subject to "the overriding instructions of Article III ¶2 hereof." Paragraph 8 states that the "Trust shall be closed and the assets *transferred* to Mary Reeves Davis' husband." (emphasis added) Article V, however, provides further limitations. It provides that paragraph 8 is "subject to the *overriding instructions*" of Article III, ¶2. (emphasis added) The latter provides that the Trustee will essentially divide the proceeds of "each such payment" as contemplated by the Agreement with half being held in trust for Mary Reeves Davis and half being paid to Terry Davis. The Agreement however does not mention these "payments." Further, the only paragraph in the Agreement which is similar in topic is paragraph 7 and it provides:

> The monies for establishing the Trust shall be fifty percent (50%) of the funds paid by United Shows of America (officers of which are Ed Gregory and Jim Ed Brown) for the properties held by Mary Reeves Davis and/or Mary Reeves Davis and Terry Davis, in the amount of approximately 7.3 million dollars (7,300,000.00). These funds shall be paid directly to the Trust by the purchasers of these properties.

(continued...)

conclude that the provision in the Trust contain a latent ambiguity, we hold that the trial court did not err in allowing extrinsic evidence of Mrs. Davis's intent. In light of our holding, our review of the trial court's findings with regard to Mrs. Davis's intent is governed by Tenn. R. App. P. 13(d) and, therefore, "shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." The only testimony or facts in dispute in this matter are those offered through the testimony of Terry Davis and Carrol Kilgore. The trial court excluded Mr. Davis's testimony under the Dead Man's Statute, which provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party...

T.C.A. § 24-1-203 (2001)

---

[9](...continued)

Further, paragraph 8 uses the term "assets" which is clearly different than the term "payments"–"assets" being more inclusive and "payments" being more limited.

The terminology used in paragraph 8 of the Agreement is of particular interest. In pertinent part it reads "the Trust shall be closed and the assets *transferred to* Mary Reeves Davis' husband." (emphasis added) What is meant by the word "*transferred*"? Should one infer that Terry Davis, or more technically *Mary Reeves Davis' husband* is to receive the transfer of the assets in a fiduciary capacity as the executor under her will with the resulting affirmative duty to "administer" her probate estate, or does it mean that her husband is to receive the transfer of assets as his property *in fee* without the duty of probate administration.

Endeavoring to limit its examination to within the four corners of the documents, the Court has examined other relevant terminology in the Trust and Agreement. In Article III (1) of the Trust, the following terminology is used, the "Trustee shall *receive*...all monies to be paid out...of the aforesaid contracts...." (emphasis added) Are the words "transfer" and "receive" synonymous in the sense that a personal right of ownership does or does not attach? Do both imply an interest in fee or do they impose a fiduciary responsibility with reference to what is transferred or received?

Moreover, why does Article V provide that "[if] *payment directly* to my husband be not authorized thereby,...(referring to paragraph 8 of the Agreement with emphasis added) such mon[ies] shall be paid into my estate in accordance with Article IV hereof"? Should one infer the same or a different meaning from the phrase "payment directly to" my husband as distinguished from the phrases "transfer" and/or "receive" as used elsewhere in the two documents?

(footnotes omitted).

-17-

We find that Mr. Davis's testimony falls within the Dead Man's Statute in that Mr. Davis is a party to this action against the Administrator of the Estate and he is seeking to testify against the Estate concerning a "transaction or statement by [Mrs. Davis, the Decedent]." Consequently, the trial court was correct in excluding Mr. Davis's testimony. The testimony of Mr. Kilgore, however, was not negated by the Dead Man's Statute and was admissible for the limited purpose of resolving the latent ambiguity. Since Mr. Davis's testimony was properly excluded under the Dead Man's Statute, Mr. Kilgore's testimony is uncontested. We have reviewed Mr. Kilgore's testimony, in conjunction with the trust instrument, and we find that the evidence does not preponderate against the trial court's finding that Mrs. Davis intended to "provide for the welfare of herself and her husband while she was living and upon her death to pass her assets, inclusive of the Trust assets, to her probate estate for probate administration."

Although the case was tried in the trial court on the theories heretofore set out, we consider the controlling issue in this case to be whether the provision of the Trust, under which the Appellant claims the right to the trust estate, is valid. In essence, Paragraph 5 of the trust instrument provides that if the settlor of the Trust, Mrs. Davis, predeceases her husband, the Appellant herein, the trustee of the Trust may make distribution to Mrs. Davis's husband as provided therein. The language of this provision, under which the Appellant claims, is a testamentary disposition of the trust estate. As this Court noted in *Estate of Sinclair v. Keith Sinclair, Inc.*, 894 S.W.2d 747 (Tenn. Ct. App. 1994):

> An instrument taking effect at the death of the maker is a will. *See Pritchard on Wills*, Vol. 1, § 19. It follows, therefore, that to be valid such an instrument must comply with the statutory requirements necessary to constitute a valid will. *Wright v. Huskey*, 592 S.W.2d 899 (Tenn. Ct. App. 1979). A conveyance of a present interest, however, is not testamentary in character, even though the enjoyment of the rights conveyed are postponed until the death of the donor or grantor. *Couch v. Hoover*, 18 Tenn.App. 523, 79 S.W.2d 807 (1934). The intent of the grantor--whether he intends to pass a present irrevocable interest or one that takes effect at his death--is controlling. *Cockrell v. Tuell*, 61 Tenn.App. 423, 454 S.W.2d 713 (1970).

*Id.* at 749.

The gravamen of the issue is Mrs. Davis's intent, that is whether she intended to "pass a present irrevocable interest or one that [took] effect at [her] death." *Cockrell*, 454 S.W.2d 713. From the plain language of Paragraph 5 of the trust instrument, it is clear that the provision for Mr. Davis to acquire the property under the instrument is only triggered in the event of the death of Mrs. Davis. Accordingly, we construe Paragraph 5 to be a testamentary disposition, which must comply with the requirements for a testamentary document found at T.C.A. § 32-1-104 (2001). Since the instrument under which Mr. Davis claims does not comply with the formalities required for a valid will, the provision of the agreement (i.e. Paragraph 5), insofar as it attempts to vest any property in Mr. Davis, is invalid. The assets of the Trust, therefore, become a part of

the Estate of Mrs. Davis and will be dealt with according to the instructions in her last will and testament.

For the foregoing reasons, the order of the trial court granting summary judgment to Appellee is affirmed. Costs of the appeal are assessed to the Appellant, W. Terry Davis, and his surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.