IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 11, 2007 Session

# ROBERT J. YOUNG COMPANY v. NASHVILLE HOCKEY CLUB LIMITED PARTNERSHIP

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 05-1271 II     The Honorable Carol McCoy, Chancellor**

---

**No. M2006-2511-COA-R3-CV - Filed March 26, 2008**

---

This case arises from a contract dispute between the parties. The Appellant herein, Nashville Hockey Club, entered into a "Sponsorship Agreement" with the Appellee herein, Robert J. Young Company. Subsequently, the parties agreed to change their agreement. As a result, the parties entered into a subsequent "Letter of Agreement." When a players' strike occurred, Appellee wished to cancel the contract. Appellant claimed that the "Sponsorship Agreement," and particularly the force majeure clause contained therein, were not superseded by the "Letter of Agreement." The trial court granted summary judgment against Appellee and, following a hearing on Appellant's counter-claim, granted judgment in favor of Appellant but did not award damages based upon its finding that Appellant had mitigated all of its damages. Appellant appeals on the issue of damages. Appellee appeals on the issue of what, if any, agreement exists between the parties. Finding that the plain language of the "Letter of Agreement" supports a finding that same supersedes the "Sponsorship Agreement," we reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, J. delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S. and JEFFREY STEWART, SP.J., not participating.

Robert J. Walker and John L. Farringer IV of Nashville, Tennessee for appellant, Nashville Hockey Club Limited Partnership

Ralph W. Mello of Nashville, Tennessee for Appellee, Robert J. Young Company

## OPINION

The material facts of this case are undisputed. Robert J. Young Company ("RJY," or "Appellee") and the Nashville Hockey Club Limited Partnership ("NHC," or "Appellant") first discussed entering into a sponsorship agreement in 1997. On February 20, 1998, the parties entered

into a "Letter of Intent." Thereafter, on September 1, 1998, the parties entered into a "Sponsorship Agreement." By its own terms, the "Sponsorship Agreement" was to run from July 1, 1998 until June 30, 2001. Under the "Sponsorship Agreement," RJY agreed to purchase fourteen season tickets to Predator hockey games and to pay an annual sponsorship fee (paid in six equal installments) for two dasher-board panels. The NHC, in turn, agreed to pay for certain office equipment and related services from RJY. Section Eleven of the "Sponsorship Agreement" contains a force majeure clause, which reads as follows:

> 11. FORCE MAJEURE.
>
> In the event compliance with any of the parties' obligations under this Agreement is impractical or impossible due to any emergency, including, but not limited to, player strikes, management lockouts, labor disputes, embargoes, flood, earthquake, storm, lightning, fire, epidemic, acts of God, war, national emergency, civil disturbance or disobedience, riot, sabotage, terrorism, threats of sabotage or terrorism, restraint by court order or order of public authority, failure of machinery or equipment or any other occurrence beyond the parties' reasonable control (each such occurrence being an "Event of Force Majeure"), then the time for performance of such obligations shall be extended for a period equal to the duration of the event of Force Majeure.

The parties also agreed, in Section Thirteen of the "Sponsorship Agreement," to arbitrate any disputes arising out of the agreement, and for payment of reasonable attorneys' fees and other expenses for the prevailing party.

Within a short period of entering into the "Sponsorship Agreement," RJY approached the NHC to consider changing the terms of the "Sponsorship Agreement." Specifically, RJY wanted to trade in its season tickets for one of the luxury suites at the Gaylord Entertainment Center (the "Arena"). RJY also proposed the creation of a business center for use by the luxury suite owners at the Arena that would be named the "Robert J. Young Business Center." In addition, RJY asked to be named the official sponsor of the Predators for a ten-year-term–a title it could advertise on its trucks, website, and marketing materials.

Following negotiations, in late October 1998, the parties entered into a "Letter of Agreement." The "Letter of Agreement" reads, in pertinent part, as follows:

> The suite is listed at $100,000 per year. We agreed to the following compensation structure:
>
> - Term: 10 years, 1998-2008
> - Annual Escalation: 3% increase commencing in year four.
> - Compensation: $75,000 in year one.

-      <u>Trade In</u>:              R.J. Young will return four club seats and 10 upper level season tickets ($25 seats).
-      <u>Barter Agreement</u>:     R.J. Young to provide the following equipment over the term of the agreement
  1. Copier fax for the business center,
  2. A high speed copier,
  3. A high speed digital copier/printer.

         *                    *                    *

I. **Sponsor Agrees to Provide Club:**

|  | **Suite Licensing Fee** | **Sponsorship Fee** |
|---|---|---|
| Year 1, 1998-99 | $ 75,000.00 | $ 125,000.00 |
| Year 2, 1999-2000 | 75,000.00 | 128,750.00 |
| Year 3, 2000-2001 | 75,000.00 | 132,812.50 |
| Year 4, 2001-2002 | 77,250.00 | 136,591.00 |
| Year 5, 2002-2003 | 79,568.00 | 140,689.00 |
| Year 6, 2003-2004 | 81,955.00 | 144,910.00 |
| Year 7, 2004-2005 | 84,414.00 | 149,257.00 |
| Year 8, 2005-2006 | 86,949.00 | 153,735.00 |
| Year 9, 2006-2007 | 89,554.00 | 158,347.00 |
| Year 10, 2007-2008 | 92,241.00 | 163,097.00 |

In exchange, the NHC agreed to pay RJY for certain office equipment, leasing, and service for ten years.

The parties performed consistent with the terms of the above "Letter of Agreement" from 1998 until 2004. RJY was provided Suite C-15, the business center on the main suite level at the Arena was named the "Robert J. Young Business Center," and the NHC paid for the agreed-upon copy equipment and services from RJY.

The Predators' 2004-2005 season was delayed and eventually canceled as a result of work stoppage arising from the expiration of the collective bargaining agreement between NHL players and NHL owners. In response to the work stoppage, by letter of December 7, 2004, RJY informed the NHC that it was "canceling" the contract. By letters dated January 11, 2005 and January 26, 2005, the NHC informed RJY that the NHC believed that RJY had no legal basis to terminate the contract. Specifically, the NHC raised the force majeure clause of the "Sponsorship Agreement." In response, RJY took the position that the October 1998 "Letter of Agreement," *supra*, superseded the "Sponsorship Agreement," and that this "Letter of Agreement" contained no force majeure

clause. Consequently, RJY contends that, because the players strike had frustrated the purpose of the contract, it was justified in ceasing performance.

On May 18, 2005, RJY filed suit against the NHC.[1] In its Complaint, RJY seeks rescission of the October 1998 "Letter of Agreement" due to alleged "frustration of commercial purpose."[2] On July 8, 2005, the NHC filed its Answer and Counterclaim.[3] In its Answer, the NHC denies the material allegations of the Complaint. In its Counterclaim, the NHC alleges breach of contract on the part of RJY, and cite to the force majeure clause of the original "Sponsorship Agreement."

Following entry of RJY's "Second Amended Complaint," *see* fn. 2, the NHC filed a Motion for Summary Judgment on July 14, 2006, seeking judgment on all of RJY's claims. The NHC's motion was granted by Order of September 13, 2006, thereby leaving only the counterclaims asserted by the NHC. These issues were tried by the court, sitting without a jury, on September 11 and 12, 2006. On October 11, 2006, the trial court entered its "Final Order and Judgment," which reads, in pertinent part, as follows:

> For the reasons set forth in the transcript, the Court finds as follows:
>
> (i) There was an enforceable and sufficiently definite agreement between R.J. Young and Hockey Club.
>
> (ii) R.J. Young materially breached the parties' agreement.
>
> (iii) R.J. Young's breach would have caused the Hockey Club to incur damages but for the Court's finding on mitigation *infra*.
>
> (iv) The Hockey Club is therefore the prevailing party but the Court declines to award the Hockey Club its attorneys fees because the provision of the parties' agreement that calls for an award of attorneys fees to the prevailing party references an arbitration proceeding, and these proceedings arose from a lawsuit filed by R.J. Young and the compulsory counterclaims asserted by the Hockey Club in response.

---

[1] In this Complaint, RJY also names the Nashville Predators, L.LC. as a defendant. In response, the Predators filed a motion to dismiss, which motion was granted by Order of August 9, 2005. Consequently, the NHC is the sole appellant in this appeal.

[2] On June 20, 2005, RJY filed its "First Amended Complaint." RJY filed its "Second Amended Complaint" on October 19, 2005. In the "Second Amended Complaint," RJY seeks to avoid its contractual obligation on theories of frustration of commercial purpose, failure of consideration, lack of mutual assent, and breach of contract on the part of NHC.

[3] RJY also filed a motion for summary judgment, which motion was subsequently denied by Order of August 9, 2005.

(v) Although it is the prevailing party, the Court declines to award the Hockey Club any damages because the Court holds that the Hockey Club mitigated all of its damages. The basis for this determination is set forth on pages 106 to 109 of the attached transcript, which is incorporated by reference.

In its ruling from the bench, which is incorporated into the above Order, the trial court specifically found that "the parties conducted themselves as though terms of both agreements [the original "Sponsorship Agreement" and the subsequent "Letter of Agreement"] were in effect, and the Court does not find that the language that the ["Letter of Agreement"] will supersede the previous Letter of Agreement resulted in a cancellation or an avoidance of some of the provisions of the ["Sponsorship Agreement"]." In addition, the trial court reviewed the material evidence concerning mitigation of damages and concluded, as set out in its Order, that the NHC's was not entitled to damages. Furthermore, concerning attorneys fees, the trial court interpreted the "Sponsorship Agreement" to contain only a provision for attorneys fees in the case of arbitration. Because this case arose out of a cross-suits filed by the parties, arbitration did not occur and, consequently, the trial court concluded that neither party is entitled to its fees and costs.

The NHC appeals and raises four issues for review, as stated in its brief:

1. Whether the trial court erred in finding that the [NHC] was entitled to no damages despite its holding that R.J. Young breached the parties' Sponsorship Agreement.

2. Whether the trial court erred in charging the [NHC] with failure to mitigate the barter portion of their damages resulting from R.J. Young's breach of the parties' Sponsorship Agreement when acceptance of R.J. Young's barter would have precluded the [NHC] from otherwise mitigating their damages.

3. Whether the trial court erred in finding that the [NHC] had fully mitigated the cash damages resulting from R.J. Young's breach of the parties' Sponsorship Agreement by entering into a materially different sponsorship agreement with a third party.

4. Whether the trial court erred in failing to award the [NHC] their attorneys' fees pursuant to the Sponsorship Agreement.

In the posture of Appellee, RJY raises the following additional issues for review:

1. Whether the trial court erred in finding that there was an enforceable agreement between the parties.

2. Whether the trial court erred in finding that the undated Letter Agreement amended rather than super[s]eded the prior Sponsorship Agreement.

3. Whether the trial court erred in finding that the Appellant was the prevailing party.

Because RJY's issues involve the threshold consideration of what, if any, enforceable agreement exists between the parties, it is necessary for us to first address this question before reviewing the award of damages issues raised by the Appellant herein. Appellee's issue necessarily involves the question of whether summary judgment on RJY's counterclaim was proper.

It is well settled that a motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Id*. at 211 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). Because only questions of law are involved, there is no presumption of correctness regarding a trail court's grant or denial of summary judgment. *See Bain*, 926 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn.1997).

The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn.1975). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79 (Tenn.Ct.App.1983). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat'l Bank*, 620 S.W.2d 526 (Tenn.Ct.App.1981). A contract is not ambiguous

merely because the parties have different interpretations of the contract's various provisions, ***Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc***., 884 S.W.2d at 462 (citing ***Oman Constr. Co. v. Tennessee Valley Authority***, 486 F.Supp. 375, 382 (M.D.Tenn.1979)), nor can this Court create an ambiguity where none exists in the contract. ***Cookeville P.C.***, 884 S.W.2d at 462 (citing ***Edwards v. Travelers Indem. Co.***, 201 Tenn. 435, 300 S.W.2d 615, 617-18 (1957)). The interpretation of a written contract is a matter of law and not of fact, ***see Rainey v. Stansell***, 836 S.W.2d 117 (Tenn.Ct.App.1992). Consequently, construction of the contract is particularly suited to disposition by summary judgment. ***Id***. at 119. Therefore, we review the trial court's finding concerning the agreement between these parties ***de novo*** upon the record with no presumption of correction accompanying the trial court's conclusions of law. ***See*** Tenn. R. App. P. 13(d); ***Waldron v. Delffs***, 988 S.W.2d 182, 184 (Tenn. Ct. App. 1998); ***Sims v. Stewart***, 973 S.W.2d 597, 599-600 (Tenn. Ct. App. 1998).

The contention between these parties involves the question of whether, as RJY asserts, the "Letter of Agreement" supersedes the "Sponsorship Agreement," or whether, as the NHC argues, the "Letter of Agreement" merely revises or amends certain terms of the "Sponsorship Agreement." 17B C.J.S. Contracts §§ 434 and 435 (1999) provide guidance concerning subsequent agreements made by parties to a contract, and the effect of the subsequent agreements on the original agreement, to wit:

### § 434. Discharge by new contract

A contract may be discharged or abrogated by a new contract with the effect of altering the terms of the original or of rescinding it altogether.

Subsequent to the execution of a written contract, it is competent for the parties, by a new contract, not necessarily in writing, either to abandon, waive, or annul the prior contract. The parties to an agreement may also agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter. However, making subsequent contracts that deal with the same subject matter as the earlier contracts does not abrogate the previous instruments ***unless the subsequent contract either explicitly rescinds the earlier instruments or deals with the subject matter of those instruments so comprehensively as to be complete within itself***...

       \*             \*             \*

### § 435. Subsequent inconsistent agreement; Substituted contracts

A contract complete in itself will be conclusively presumed to supersede a prior one between the same parties and concerning the

same subject matter where the terms of the two are so inconsistent that they cannot subsist together.

If the parties to a prior agreement enter into a subsequent contract that completely covers the same subject, but the second agreement contains terms that are inconsistent with those of the prior agreement, and the two documents cannot stand together, the later document supersedes and rescinds the earlier agreement.... When the parties intend a new contract to replace all the provisions of an earlier contract, the new contract is termed the substituted contract....

However, deviations or changes in a contract do not necessarily abrogate it or imply its abandonment, and where it is claimed that by reason of inconsistency between the terms of a new agreement and those of the old the old one is discharged, *the fact that such was the intention of the parties must clearly appear*.

17B C.J.S. Contracts §§ 434 and 435 (1999) (footnotes omitted) (emphasis added).

From the above authority, it is the intent of the parties that controls the question of abrogation by subsequent agreement. And, as noted above, the intention of the parties is to be ascertained, whenever possible, from the usual, natural, and ordinary meaning of the words used by the parties in their agreement. *See Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79 (Tenn.Ct.App.1983).

As set forth in the fact section above, the parties entered into a "Letter of Intent" on February 20, 1998. Thereafter, on September 1, 1998, the parties entered into the "Sponsorship Agreement." In October of 1998, the parties renegotiated certain terms of the "Sponsorship Agreement" and entered into an undated "Letter of Agreement." This "Letter of Agreement," which was drafted by the NHC, reads, in relevant part, as follows:

Outlined below is the *revised sponsorship agreement* that includes the luxury suite in the Nashville Arena, Suite C-15. *This agreement will supersede the previous Letter of Agreement* between Robert J. Young and the Nashville Predators. Please review the terms and conditions and if the information contained in this document is accurate, please sign and return the executed copy to the Predators.

\*                              \*                              \*

Please note that *this Letter Agreement will act as a contract* by and between the Predators and Robert J. Young. Therefore, please acknowledge your acceptance of the terms of this Letter Agreement by executing the copy enclosed herewith and returning it to the Nashville Hockey Club Limited Partnership.

-8-

(Emphasis added).

As discussed above, the trial court determined that this "Letter of Agreement" amended, but did not supersede, the "Sponsorship Agreement." On appeal, RJY contends, *inter alia*, that the "Letter of Agreement" did supersede the "Sponsorship Agreement," thereby abrogating the force majeure clause contained therein. Upon initial review, the "Letter of Agreement" certainly changes the terms of the "Sponsorship Agreement." These new terms are very specifically enumerated in the "Letter of Agreement." Consequently, we find that the "Letter of Agreement" (as far as the obligations of the respective parties) is specific and clear enough to stand alone and independent of the "Sponsorship Agreement." Nonetheless, we must determine whether this reading fairly and accurately depicts the parties' intentions.

The "Letter of Agreement" makes only one reference to the sponsorship agreement–in the first sentence where the document purports to be "the revised sponsorship agreement." Applying the plain and ordinary meaning, these words appear to indicate that this is a new, and separate, agreement–i.e. the revised sponsorship agreement. The parties do not state that the "Letter of Agreement" (or any portion thereof) *revises* the "Sponsorship Agreement," or that the "Letter of Agreement" contains revisions, or amendments, or changes to the "Sponsorship Agreement." Rather, the parties state that the contents of the "Letter of Agreement" constitute "the revised sponsorship agreement." In legal parlance the adjective "revised" usually signifies a different, and separate, document that stands alone. For example, a "revised statute" is defined as a "body of statutes which have been revised, collected, arranged in order, and *re-enacted as a whole*." Black's Law Dictionary (6th ed. 1990). Likewise, and as an additional illustration, an "amendment" to a complaint merely modifies an original complaint, which complaint remains before the court as modified. However, an "amended complaint" is complete in itself without adoption or reference to the original, and has the effect of superseding or abrogating the original as a pleading. *See, e.g., Louisville & N.R.Co. v. House*, 56 S.W. 836 (Tenn. 1900). Although use of "revised sponsorship agreement" does not definitively prove the parties' intent to have the "Letter of Agreement" replace the "Sponsorship Agreement," it does provide some evidence for that finding.

Moving to the second sentence of the "Letter of Agreement," the parties indicate that "[t]his agreement will supersede the previous Letter of Agreement...." As discussed above, the trial court specifically stated that it "does not find that the language that the agreement will supersede the previous Letter of Agreement resulted in a cancellation or an avoidance of some of the provisions of the Sponsorship Agreement." We are troubled by this finding for two reasons. First, the parties clearly state that the "Letter of Agreement" "supersedes" a previous agreement, which they refer to as the "previous Letter of Agreement." There is no ambiguity in this term–"supersedes." Consequently, in order to give effect to the intent of the parties, we must interpret the "Letter of Agreement" to supersede some prior agreement between the parties, so long as we can determine which document the parties intended to supersede. This brings us to our second concern–that being that there is, in fact, no "previous Letter of Agreement" between these parties. As set out above, there is an initial "Letter of Intent," the subsequent "Sponsorship Agreement," and then the current and disputed "Letter of Agreement." We first note that, from a logical standpoint, there was no need to supersede the original "Letter of Intent," because same was inferentially abrogated by the parties' "Sponsorship Agreement." In reviewing a trial court's decision to resolve a contract dispute by the

-9-

mechanism of summary judgment, we must allow all reasonable inferences in favor of the non-moving party. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn.1997). Furthermore, any ambiguities in a contract are to be construed against the drafter. ***Vantage Tech. LLC v. Cross***, 17 S.W .3d 637, 650 (Tenn.Ct.App.1999) (citing ***Spiegel v. Thomas, Mann & Smith, P.C.***, 811 S.W.2d 528, 531 (Tenn.1991)). Here, the drafting party is the NHC. Moreover, as discussed above, we know, from the use of the plain, and unambiguous term "supersedes," that these parties intended the "Letter of Agreement" to, in fact, replace some previous agreement between them. Because the "Letter of Intent" was, for all intents and purposes, abrogated by the "Sponsorship Agreement," the logical inference to be drawn from the "previous Letter of Agreement" language is that the parties intended to supersede their previous agreement as set out in the "Sponsorship Agreement."

In addition, the last paragraph of the "Letter of Agreement" indicates that this "Letter Agreement will act as a contract by and between the [NHC] and [RJY]. Therefore, please acknowledge your acceptance of the terms of this Letter Agreement...." From the plain language used, the parties agree that the "Letter of Agreement" (referred to as the "Letter Agreement") will serve as a contract between them. Again, there is no reference to the "Sponsorship Agreement," nor any indication that this "Letter of Agreement" outlines only the changes thereto. Because it is incumbent upon this Court to consider the entire contract in determining the meaning of any or all its parts," *see*, *e.g.*, ***Cocke County Bd. of Highway Commissioners v. Newport Utilities Bd.***, 690 S.W.2d 231, 237 (Tenn.1985), we cannot overlook the fact that the parties use the term "Letter Agreement" to refer to this "Letter of Agreement," which the parties state is their contract. Returning to the language "previous Letter of Agreement," *supra*, based upon the language contained in the "Letter of Agreement," it is logical to infer that the use of "previous Letter of Agreement" refers to a previous contract. Because the only previous contract between the parties is the "Sponsorship Agreement," when the "Letter of Agreement" is viewed as a whole, we conclude that the parties intended to supersede their "Sponsorship Agreement" by entering into the subsequent "Letter of Agreement."

Turning briefly to the trial court's finding that the actions of the parties indicate that both the "Sponsorship Agreement" and the "Letter of Agreement" were in effect, we disagree. From our review of the record, it appears that the parties actually operated under the terms of the "Letter of Agreement" until the players' strike. At that point, the contention arose as to whether the "Letter of Agreement" superseded the "Sponsorship Agreement." In short, the parties did not draw upon the terms of the "Sponsorship Agreement" until the NHC asserted the force majeure clause. At that time, RJY claimed that the "Sponsorship Agreement" was abrogated. Moreover, as discussed above, we find that the terms of the "Letter of Agreement," including suite licensing fee and sponsorship fee schedules, are sufficiently definite to uphold the contract. Accordingly, we find that the "Letter of Agreement" constitutes the contract between these parties as same supersedes the "Sponsorship Agreement." Consequently, we find that the trial court erred in granting summary judgment on RJY's claims. Based upon our holding that the "Sponsorship Agreement" is no longer in effect, we also find that the trial court erred in its damages analysis and in its finding of fault in this case.

Based upon the foregoing, we reverse the trial court's Order of September 13, 2006 dismissing RJY's claims by summary judgment. We also reverse the trial court's Order of October

11, 2006, same being based upon an erroneous finding that the "Sponsorship Agreement" was in effect at the time of the alleged breach. The matter is remanded for such further proceedings as may be necessary, including, but not limited to, RJY having the opportunity to prove its claims, as well as any damages arising therefrom. Costs of this appeal are assessed one-half to the Appellant, Nashville Hockey Club, L.P., and its surety, and one-half to the Appellee, Robert J. Young Company.

_____
W. FRANK CRAWFORD, JUDGE